_____

No. 95-1824

_____


C. L. Maddox, Inc., a Delaware      *
Corporation,                        *
                                    *
          Appellee,                 *
                                    *
     v.                             *
                                    *
The Benham Group, Inc., an          *
Oklahoma Corporation,               *
                                    *
          Appellant,                *
                                    *
Dynalogic Engineering, Inc., a      *
Michigan Corporation,               *
                                    *
          Defendant.                *


     _____                        Appeal and Cross-Appeal
                                        from the United States
     No. 95-1992                        District Court for the
     _____                        Eastern District of Missouri.


C. L. Maddox, Inc., a Delaware      *
Corporation,                        *
                                    *
          Appellant,                *
                                    *
     v.                             *
                                    *
The Benham Group, an Oklahoma       *
Corporation; Dynalogic             *
Engineering, Inc., a Michigan       *
Corporation,                        *
                                    *
          Appellees.                *


                         _____

          Submitted:  February 12, 1996

               Filed:  July 3, 1996
                         _____

Before MAGILL, HEANEY, and MURPHY, Circuit Judges.
                         _____

MAGILL, Circuit Judge.

In this complicated breach of contract action in which the jury awarded $5 million to C. L. Maddox, Inc. (Maddox), The Benham Group, Inc. (Benham) appeals several rulings made by the district court during trial. Maddox cross-appeals the district court's $1,467,000 reduction in the damages award to Maddox. We affirm in part and reverse in part.

## I. BACKGROUND

The dispute between the parties has its origins in the extensive and expensive remodeling of a coal processing system at an electrical power plant in Joppa, Illinois. The owner of the plant, Electric Energy, Inc. (EEI), contracted with Maddox to serve as the general contractor for the project. Maddox subcontracted with Benham to perform the engineering work and with Dynalogic Engineering, Inc. (Dynalogic) to provide the necessary computer hardware and software.

The project did not go well, and Maddox was forced to sue Benham and Dynalogic for breach of contract. In its complaint, filed January 24, 1992, Maddox alleged that Benham and Dynalogic breached their respective contracts, and that they made fraudulent and negligent misrepresentations.[1] Maddox sued Benham for $5,151,085. This figure included $2,746,717.98 for damages resulting from errors by Benham in furnishing information for Maddox to use in bidding on the project; $1,137,000, constituting the amount spent by EEI to repair or replace equipment that Maddox had supplied on the project; and $1,267,367.02 for a breach of Subcontract ¶ 2.1.6, requiring that Benham would guard against defects and deficiencies in the work of Maddox. Maddox also sued

_____

[1]The two misrepresentation counts were dismissed by the trial court, and this ruling has not been appealed.

Dynalogic for $330,000, the cost to EEI to replace the computer control system.  Benham and Dynalogic each counterclaimed against Maddox for monies that they alleged were due them on their respective contracts.

The project began in March 1990, when EEI started soliciting bids. Jack Craig, a marketing agent for both Maddox and Benham, responded to the solicitation.  In April and May of 1990, Maddox submitted several preliminary design/build[2] proposals to EEI.  Each proposal increased in costs and complexity to meet changing requests made by EEI.  The proposals were the combined product of Craig, Mike Dover (Maddox's project manager), and Benham personnel.  EEI reviewed the proposals and approved the design concept.

To assist it in preparing its formal proposal, Maddox entered into an oral agreement with Benham on June 1, 1990, under which Benham would complete the drawings and specifications necessary for the bid and provide Maddox with equipment lists and with quantity information.  Benham was to receive $58,200 for this work.  The terms of this oral contract were memorialized by Clete Schierman, Benham's project manager, who had prepared a chronology of the project and noted that, on June 1,

> EEI approves $58,200 for TBG [Benham] to begin in-depth study of equipment layouts, equipment sizing and to supply necessary information and assistance for CLM [Maddox] to prepare a final construction cost (lump sum) for the project.  TBG [Benham] is to develop a final lump sum engineering cost.

Appellant's App. at 206.  This chronology was offered at trial as

---

[2]Under a design/build contract, the contractor agrees to both design and build the project.  This differs significantly from traditional construction arrangements in which an architect/engineer first designs the project and prospective contractors then submit bids on the basis of the designer's drawings and specifications.

Plaintiff's Exhibit 24.

Maddox relied heavily on the estimates provided by Benham. Curt Maddox, president of Maddox, Inc., testified that the only way Maddox would have bid on the project was to rely on the estimates of Benham because Benham possessed all of the design information. Dover testified that in preparing the bid, he had to rely on the material quantity estimates provided by Benham. On the basis of this information, Maddox submitted a formal proposal on July 5, and EEI issued a letter of intent to Maddox. The final contract, signed on September 28, was for a fixed price of $10,326,881.

In mid-September of 1990, Maddox and Benham entered into a written subcontract for much of the design work on the project. This contract was retroactively dated "as of June 1, 1990," and it provided that Benham would perform its design work by January 2, 1991. Article 2 of the agreement described the "Basic Services" that Benham was to perform for a fixed price of $616,050. Under ¶ 2.1.6 of Article 2, Benham agreed that it would keep Maddox "informed of the progress and quality of the Work, and shall endeavor to guard [Maddox] against defects and deficiencies in the Work of [Maddox]." Appellant's App. at 184. The Basic Services further included the preparation of construction drawings, but did not include the compilation or preparation of bidding information. Rather, ¶ 3.4 of the contract provided that Maddox "shall furnish all cost estimating services required for the Project." Appellant's App. at 186. The contract contained a strict integration clause, providing that all prior agreements were superseded. Subcontract ¶ 7.5.1.

Benham suggested that Dynalogic design a separate part of the computer control system to be used at EEI. In August, Dynalogic submitted a separate additional proposal to Maddox to design part of this system. The proposal was accepted by Maddox in a November 29, 1990 purchase order for $82,750.

From the start of the project, Maddox experienced problems with Benham.  Benham was late in producing drawings; the drawings actually produced were often insufficient; and Benham underestimated the amount of work actually required to complete the final design.  Dover testified that there were delays in getting drawings for the fabrication work.  Jack Jenkins, Maddox's electrical supervisor, testified that prints for the electrical components of the project were not available, requiring that he lay much of the wiring for the project without plans, entailing a greater cost.[3]

Benham countered that not all of the delay problems were Benham's fault.  On cross-examination, Dover conceded that some of the delays in drawings were caused by EEI's continued alteration of the project.  Other delays were caused by Maddox, which often failed to timely submit to Benham vendor-prepared drawings after purchasing equipment.  Further, Maddox was not always timely in its approval of Benham's drawings, which only further delayed the submission of the drawings to EEI.

At trial, Maddox introduced evidence of Benham's project errors and design deficiencies.[4]  Maddox called an expert witness, Douglas Waring, to testify as to these errors.  After examining

---

[3]Dover and Mike Kondritz, a Maddox employee who did not testify at trial, prepared a color coded chart which documented the delay claims by showing when drawings were furnished by Benham.  This chart was admitted at trial over strenuous objection by Benham.  The chart summarized a drawing log prepared by Kondritz during the course of the project.  The drawing log indicated when drawings were received by Maddox and sent out to EEI.  See Plaintiff's Exhibit 108.

[4]The design deficiencies were detailed by Plaintiff's Exhibit 163, a list of 101 design deficiencies noted by Maddox.  Maddox testified that he prepared this list by personally reviewing the set of field construction drawings and then investigating each problem at the job site, comparing the drawing to the actual construction.  See Plaintiff's Exhibit 163, reprinted in Appellant's App. at 304.

numerous depositions and documents from the project and visiting the project site, Waring concluded that: Benham underestimated the project's engineering requirements; that the project objectives were not properly defined; that Benham failed to properly schedule their work to allow Maddox to meet the construction schedule; that the project was understaffed by Benham; that Benham's drawings were lacking in the knowledge of materials handling; that Benham underestimated the number of drawings that the project would require; and that although Benham assumed the total engineering function on the job, there was no evidence of experience by Benham in handling very large material handling projects.

To counter Waring's testimony, Benham put on an expert witness, Don Samples, who testified that Benham's drawings met applicable standards. He contradicted Maddox's design deficiency claims. Benham also offered Defendant's Exhibit J-13, which was a thorough written response to the items contained in Plaintiff's Exhibit 163.

Maddox and EEI also experienced problems with Dynalogic. Dean Bafford, a senior engineer at EEI, testified that EEI had no confidence in the computerized control system built by Dynalogic, and it felt that Dynalogic never produced a product for the project that was dependable. Further, Bafford noted that EEI found numerous deficiencies in the software supplied by Dynalogic, but the problem was never corrected by Dynalogic. The system never operated correctly, and EEI eventually had to replace the entire computer control system. The replacement cost for the system was $330,000.

In addition to the evidence introduced at trial on whether Benham and Dynalogic breached their contracts, Maddox introduced evidence of its estimated damages. This evidence was strenuously objected to at trial by Benham as being hearsay and without foundation.

At trial, Maddox set out how it arrived at the $2,746,717.98 figure for damages due to bidding errors, engineering errors, and time delays. See Plaintiff's Revised Exhibit 135, reprinted in Appellee's App. at 681. In preparing this exhibit, Curt Maddox took information from corporate records and calculated the total man-hours, labor, equipment, and materials expended on the project. The exhibit set forth in detail how each figure was determined. Once these calculations were made, Maddox then calculated the difference between the amount actually expended by Maddox for the project and the bid amount made by Maddox when it relied upon the estimates given to it by Benham.

Maddox also sought to introduce at trial evidence that it was liable to EEI for $1,467,000, the amount it cost EEI to replace or repair the defective equipment supplied under the contract. Bafford testified extensively as to the problems with the finished system and the cost to EEI to fix or replace these problems. He further testified that the errors appeared to be design errors (and thus the responsibility of Benham and Dynalogic, who performed all of the equipment design). Both Bafford and Robert Powers, another EEI employee, testified at trial that EEI would look to Maddox to reimburse EEI for the cost of these repairs and replacements.

The court, however, did not allow any evidence regarding specific damages suffered by Maddox due to EEI's replacement of equipment. As part of the final contract award, Maddox was required to post a performance bond, through United States Fidelity and Guaranty (USF&G), of $4 million. EEI called the bond in June 1992, and USF&G paid to EEI approximately $2.8 million. Although Maddox was fully liable to USF&G on this bond, the trial court would not permit Maddox to introduce any testimony regarding it, considering the evidence too prejudicial. Further, the trial court would not let Maddox make an offer of proof on this issue.

At the close of evidence, the judge instructed the jury on

liability.  In Instruction No. 7, the judge told the jury that:

> Your verdict must be for the plaintiff against the defendant The Benham Group, Inc. if you believe:
>
> First, plaintiff C. L. Maddox, Inc. and defendant The Benham Group, Inc. entered into agreement for Benham to provide engineering services; and
>
> Second, plaintiff C. L. Maddox, Inc. performed its obligations under that agreement; and
>
> Third, defendant The Benham Group, Inc. failed to perform its obligations under that agreement; and
>
> Fourth, C. L. Maddox, Inc. was thereby damaged.

Appellant's App. at 103.  Benham objected to the instruction, contending that it was vague because it did not distinguish among the four separate theories of breach of contract put forth by Maddox.  Benham offered five supplementary instructions, which were rejected by the court.

The jury returned a verdict in favor of Maddox and against Benham for $5,000,100, the amount requested by Maddox during closing arguments,[5] and for Maddox and against Dynalogic in the amount of $330,000.  Both Benham and Dynalogic moved to set aside, reduce, or limit the amount of the verdict or, in the alternative, for a new trial or judgment as a matter of law.

The district court reduced the verdict against Benham by $1,137,000 and the verdict against Dynalogic by $330,000, which were the costs that Maddox claimed EEI incurred in trying to remedy Benham's and Dynalogic's deficient performances.  The court noted

---

[5]Although in its complaint Maddox sought damages of $5,151,085, during closing argument counsel for Maddox rounded this figure down to $5,100,000.  However, he misspoke during summation and requested that the jury return a verdict for $5,000,100.  See 21 Trial Tr. at 133.

-8-

that "Maddox introduced no evidence during the five weeks of trial that Maddox was damaged by the costs to EEI to replace and modify certain equipment," Mem. & Order at 8, and thus Maddox failed to offer proof of an essential element in a breach of contract action, see U.S. Durum Milling, Inc. v. Frescala Foods, Inc., 785 F. Supp. 1369, 1373 (E.D. Mo. 1992) (citing Vandever v. Junior College Dist. of Metro. Kansas City, 708 S.W.2d 711, 716 (Mo. App. 1986)) (proof of damages is an essential element in a breach of contract case).

## II.  BENHAM'S APPEAL

Benham makes several arguments on appeal.  Initially, Benham argues that Maddox should not have been able to present evidence of an oral agreement to supply bidding information to Maddox, because evidence of the oral agreement should have been precluded by the parol evidence rule. Alternatively, Benham argues that Plaintiff's Exhibit 135 was an insufficient damages calculation.  Further, Benham contends that the court erred in admitting Plaintiff's Exhibit 108 (summary of delays) and Plaintiff's Exhibit 164 (outlining design deficiencies).  Benham also contends that the court erred in not setting aside that portion of the judgment based on Benham's failure to guard Maddox against deficiencies, because there was no contractual duty binding Benham.

### A.  Bidding Errors/Design Errors/Time Delays

### 1.  Parol Evidence Rule

Under Missouri law, which controls our analysis in this diversity action, the parol evidence rule "is a rule of substantive law and not a mere rule of evidence."  Union Elec. Co. v. Fundways, Ltd., 886 S.W.2d 169, 170 (Mo. App. 1994).  We "review the district court's interpretation of state law de novo, giving its decision no deference."  Aerotronics, Inc. v. Pneumo Abex Corp., 62 F.3d 1053, 1059 (8th Cir. 1995).

The parol evidence rule prohibits evidence of prior or contemporaneous oral agreements which vary, add to, or contradict the terms of an unambiguous and complete contract absent fraud, common mistake, or erroneous admission. See CIT Group/Sales Fin., Inc. v. Lark, 906 S.W.2d 865, 868 (Mo. App. 1995); Union Elec., 886 S.W.2d at 170. However, evidence of an oral agreement that is an independent and separate agreement will not be barred by the parol evidence rule, provided that the oral agreement is not inherently in conflict with the written agreement. See Spencer v. Union Pacific R.R., 916 S.W.2d 838, 840 (Mo. App. 1996); Sedalia Merch. Bank & Trust v. Loges Farms, 740 S.W.2d 188, 193-94 (Mo. App. 1987); see also 3 Corbin on Contracts § 594 (1960 & Supp. 1994).

Given the integration clause found in Subcontract ¶ 7.5.1, it is evident that the parties intended the subcontract to be a complete expression of their intentions. However, we conclude that evidence of the prior oral agreement was admissible at trial, because the oral agreement was a wholly separate and independent contract that did not inherently conflict with the written agreement.

We begin by looking at the underlying substance of the transaction. Although the written contract was predated to June 1, it was only signed in mid-September. By this time, the oral contract for bidding services had already been entered into, executed, and paid for.[6] Thus, the oral agreement can be characterized as a separate agreement, a stand-alone contract that was bargained and paid for by Maddox.

---

[6]According to Benham's billing records, Benham submitted to Maddox a bill of $56,772.58 on July 20, 1990, and a bill of $627.42 on August 28, 1990, as compensation for its work under the Preliminary Engineering Contract. See The Benham Group Invoices, July 20, 1990 and August 28, 1990, reprinted in Appellee's App. at 603-04.

-10-

That this was a separate contract is demonstrated by the testimony of Clete Schierman.  Schierman, who, as noted above, was a senior engineer at Benham working on this project, testified that in return for the $58,200 payment ($57,400 was actually paid; see supra note 6), "it was the job of the Benham Group . . . to prepare the study, the equipment sizing, and to supply the necessary information to Maddox, so that [Maddox] could submit the final construction costs."  5 Trial Tr. at 13.  Benham provided services, and they were compensated in return for their efforts.  Under Missouri law, this constitutes a contract.  See Johnson v. McDonnell Douglas Corp., 745 S.W.2d 661, 662 (Mo. banc 1988).

Benham points to three facts in arguing that the oral contract was not a separate contract but was, instead, subsumed by the written contract.  First, although the written contract was not signed until mid-September, it was predated to June 1, 1990, before the oral contract was entered into and executed.  Second, Schierman testified that the compensation for the written contract, set at $616,050, included the $57,400 paid for the preliminary bidding work.  This could indicate that the two agreements were in fact parts of one contract.  Finally, the integration clause stated that the written contract "represents the entire agreement between [the parties] and supersedes . . . prior negotiations, representations or agreements."  Subcontract ¶ 7.5.1, reprinted in Appellant's App. at 187.

We disagree with Benham.  Where the parties bargain for a contract, payment on that contract is made, and the contract is fully performed, we have little difficulty in concluding that the parties intended this interaction to constitute a separate contract.  Benham would impermissibly elevate form over substance, which we are not willing to do.

Nor does the substance of the oral agreement inherently contradict the written agreement.  Although ¶ 3.4 of the written

-11-

contract provided that Maddox "shall furnish all cost estimating services required for the Project," this contract was titled "Agreement--Final Design." As this contract was signed two months after Maddox's bid was prepared and accepted, it is reasonable to assume that the parties might adopt a different arrangement for <u>preliminary</u> engineering services, such as preparing an initial bid for the project. Thus, there is no inherent contradiction here.

Because the oral agreement represents a wholly separate agreement from the written contract and does not inherently contradict the September agreement, the parol evidence rule is not applicable in this case. <u>See</u> <u>Spencer</u>, 916 S.W.2d at 840. Evidence of the oral agreement was properly before the jury.

**2. Implied Warranty**

Benham next contends that, even if the oral agreement is viewed as a separate contract, Maddox cannot recover under a contract theory of damages for the bidding errors because Benham never warranted the accuracy of the bidding information.

Under Missouri law, when a company represents itself as being able to do work of a particular character, a warranty is implied that the work will be performed properly. <u>See</u> <u>Biggerstaff v. Nance</u>, 769 S.W.2d 470, 473 (Mo. App. 1989); <u>Crank v. Firestone Tire & Rubber Co.</u>, 692 S.W.2d 397, 401 (Mo. App. 1985). In this case, Benham repeatedly assured Maddox and EEI that it was well qualified to do the work and that it had the manpower and expertise to do the work. Curt Maddox testified that the only way Maddox would have bid on the project was to rely on the bidding information supplied by Benham, because only Benham knew precisely what was going to be designed. 12 Trial Tr. at 91-93. Under Missouri law, these assurances created an implied warranty, allowing liability for the bidding errors. <u>See</u> <u>Biggerstaff</u>, 769 S.W.2d at 473.

## 3.  Admission of Plaintiff's Exhibits

Benham next contends that Plaintiff's Revised Exhibit 135,[7] a document created by Curt Maddox detailing the damages caused by the bidding errors, should have been inadmissible as hearsay.  Maddox counters that the exhibit, which was a summary of business records, was admissible under Rule 1006 of the Federal Rules of Evidence.  We review the district court's admission of evidence for abuse of discretion.  See Firemen's Fund Ins. Co. v. Thien, 63 F.3d 754, 757 (8th Cir. 1995).[8]

Under Rule 1006, the "contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  Fed. R. Evid. 1006.  In this case, Exhibit 135 was based on information from corporate

---

[7]Plaintiff's Revised Exhibit 135 reads as follows:

DAMAGES DUE TO ENGINEERING ERRORS/TIME DELAYS/ESTIMATES

| | | |
|---|---|---|
| 1.  | ELECTRICAL - LABOR | 1,090,040.04 |
| 2.  | MECHANICAL/STRUCTURAL | 835,832.36 |
| 3.  | MANAGEMENT/CLERICAL | 79,224.00 |
| 4.  | MATERIALS | 357,139.72 |
| 5.  | TRUCKS | 7,200.00 |
| 6.  | EQUIPMENT | 113,660.00 |
| 7.  | SMALL TOOLS | 56,640.57 |
| 8.  | FUELS | 3,500.00 |
| 9.  | PREMIUM FOR FABRICATION | 63,587.00 |
| 10. | COLD WEATHER PROTECTION | 21,175.00 |
| 11. | OFFICE SUPPORT & SUPPLIES | 6,790.00 |
| 12. | BANKING INTEREST | 111,929.29 |
| | TOTAL DAMAGES: | $   2,746,717.98 |

[8]Benham also contends that the district court erred in admitting two of Maddox's liability exhibits: Plaintiff's Exhibit 108, documenting the delay claims by showing when drawings were furnished by Benham, and Plaintiff's Exhibit 163, a list of 101 design deficiencies noted by Maddox.  Having reviewed Benham's arguments, we conclude that the admission of these documents was not an abuse of discretion.  See Firemen's Fund, 63 F.3d at 757 (standard of review).

-13-

records, including computer runs that were themselves introduced at trial. Further, as required by Rule 1006, all of the underlying information was available to Benham. The trial court did not abuse its discretion by admitting this evidence.[9]

## 4. Certainty of Damages

Finally, Benham contends that the evidence presented at trial is insufficient to prove damages with the requisite degree of certainty. In Missouri, "damages need not be established with absolute certainty, but reasonable certainty is still required as to both existence and amount [of damages]." Aluminum Prods. Enters. v. Fuhrmann Tooling & Mfg. Co., 758 S.W.2d 119, 121 (Mo. App. 1988) (quoting Haggard v. Mid-States Metal Lines, Inc., 591 S.W.2d 71, 77 (Mo. App. 1979)). A party attempting to prove damages need only place before the jury "the relevant facts tending to show the extent of damages," enabling the jury "to make an intelligent estimate of [damages] as circumstances of the case will admit." Morris v. Perkins Chevrolet, Inc., 663 S.W.2d 785, 788 (Mo. App. 1984) (quoting Truck Ins. Exch. v. Bill Rodekoph Motors, Inc., 623 S.W.2d 612, 614 (Mo. App. 1981)).

In this case, Maddox placed before the jury evidence of damages with particular clarity. Exhibit 135, and the underlying testimony supporting it, was broken down in great detail. Curt Maddox not only gave an overall damages estimate, but he broke down this estimate into its component parts. For example, testimony was

---

[9]In any event, even were the admission of Exhibit 135 to be an abuse of discretion, the error would most certainly be harmless. All of the information contained in Exhibit 135 was presented to the jury, in exhaustive detail, by Curt Maddox over the course of two days of testimony. Most of this testimony was not objected to, and where Benham did object, such damages data was removed from Exhibit 135 before the exhibit was submitted to the jury. Further, Benham does not challenge this underlying testimony on appeal. Because the substance of Exhibit 135 was properly before the jury, an error in the admission of the exhibit itself is harmless.

heard regarding the extra expenses for "electrical-labor," "mechanical/structural," "management/clerical," "materials," and the like.

Curt Maddox also testified, again in great detail, how he arrived at each of the component damages figures. For example, on the mechanical/structural damages, Maddox testified:

> I took information from corporate records, some being which are the exhibits, the computer runs, and did quantity material takeoff and labor takeoff, takeoff being counting materials or labor hours. I took the total man-hours, labor, equipment, materials purchased on the project, including all the extras, the entire job, entire project, and with a little math I took the number that represented overruns excluding extras. I took the overruns on the project and subtracted those overrun quantities from the actual total job expense.
>
> I took the estimates provided by The Benham Group and used that in the math solution and came up with the balance of damages attributed to the deficiencies of Benham over and above our contract and quantities and expectations from The Benham Group.

Testimony of Curt Maddox, 11 Trial Tr. at 6-7. Maddox introduced more than sufficient evidence to enable the jury "to make an intelligent estimate of [damages] as circumstances of the case will admit." Morris, 663 S.W.2d at 788 (quoting Truck Ins. Exch., 623 S.W.2d at 614). Therefore, Maddox proved damages of $2,746,717.98 with the requisite certainty.

Although not clearly enunciated, Benham also seems to challenge the sufficiency of the evidence supporting the jury's verdict, arguing that the jury should not have credited the evidence put forth by Maddox. Although certainty of damages and sufficiency of evidence are two very closely related issues, they are analytically distinct, and this case forces us to address each issue separately.

We review jury findings under a highly deferential standard. We resolve all conflicts in favor of Maddox, giving it the benefit of all reasonable inferences and assuming as true all facts supporting Maddox which the evidence tended to prove. We will affirm the jury's findings if a reasonable jury could differ as to the conclusions to be drawn. See Triton Corp. v. Hardrives, Inc., ___ F.3d ___, 1996 WL 288047, at *1 (8th Cir. June 3, 1996). Mindful of the deferential standard of review and the mountain of credible evidence presented by both sides, we cannot say that the jury's verdict was unsupported by the record. Benham's contention fails.

## B. Failure To Guard

During trial, Maddox presented evidence that it was damaged in an amount of $5,151,085. Of this amount, Maddox acknowledged that approximately $1.2 million worth of damages was due to errors by Maddox or EEI. See Maddox's Closing Argument, 21 Trial Tr. at 57-58; see also Plaintiff's Preliminary Damage Ex. 173, reprinted in Appellant's App. at 406. Nevertheless, Maddox argued during closing argument that Benham was liable to Maddox in this amount, because ¶ 2.1.6 of the contract required Benham to guard Maddox against Maddox's own deficiencies. Whether the contract placed this duty upon Benham is an issue of law, see Anchor Centre Partners v. Mercantile Bank, 803 S.W.2d 23, 32 (Mo. banc 1991) (construction of a written contract is a question of law, not fact), and thus we review this construction de novo, see Frank B. Hall & Co. v. Alexander & Alexander, Inc., 974 F.2d 1020, 1023 (8th Cir. 1992).

Pursuant to ¶ 2.1.6 of the subcontract, Benham "shall keep [Maddox] informed of the progress and quality of the Work, and shall endeavor to guard [Maddox] against defects and designs in the Work of [Maddox]." Appellant's App. at 184. If this were the only provision in the contract dealing with a duty to guard, we might

agree with Maddox.  However, this provision must be read in conjunction with ¶ 2.1.7, which reads:

> [Benham] shall not have control or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures . . . <u>for the acts or omissions of [Maddox]</u>, [Maddox's] subcontractors or any other persons performing any of the Work, <u>or for the failure of any of them to carry out the Work in accordance with the Construction Documents.</u>

<u>Id.</u> (emphasis added).

Given the language of ¶ 2.1.7, it is difficult to interpret ¶ 2.1.6 as shifting to Benham the risk that Maddox would not properly perform its obligations under its contract with EEI.  Specifically, ¶ 2.1.7 is clear that Benham is not responsible for the acts or omissions of Maddox, nor is Benham responsible for the failure of Maddox to carry out its work in accordance with the construction plans.  Benham simply has no duty under the contract to act as insurance against Maddox's own carelessness.

This reading of ¶ 2.1.7 does not, as Maddox suggests, render ¶ 2.1.6 inoperative.  Paragraph 2.1.6 does place a duty on Benham, namely the duty to visit the work site and make recommendations to Maddox.  What this paragraph does not do is place on Benham the further duty to guarantee that Maddox will not make any errors. Thus, the two provisions can co-exist, and giving effect to one does not render the other inoperative.  In this case, giving proper effect to ¶ 2.1.7 requires that we reverse the jury's award of $1,267,367.02 to Maddox.

### C.  Instructional Errors

Benham next contends that Instruction No. 7, used by the district court to instruct the jury on breach of contract, was inadequate.  Benham argues that the instruction, insofar as it did

not distinguish between Maddox's four distinct theories of breach, namely late drawings, errors in drawings, errors in bidding information, and failure to guard, did not give reasonable guidance to the jury.[10]

The purpose of instructing the jury is to focus attention on the essential issues of the case. The district court has broad discretion to instruct the jury in the form and language it considers fair and adequate to present the substantive law. See Hastings v. Boston Mut. Life Ins. Co., 975 F.2d 506, 510 (8th Cir. 1992). We review only for abuse of discretion, see United States v. Parker, 32 F.3d 395, 400 (8th Cir. 1994), and we will reverse "only if we find that, when viewed in their entirety, the jury instructions contained an error or errors that affected the substantial rights of the party." Hastings, 975 F.2d at 510.

The instruction is a proper statement of the law of breach of

---

[10]Maddox first contends that we should review only for plain error, because Benham's objection to the instruction did not specifically alert the judge to its vagueness challenge. In order to preserve for appeal a claim that a jury instruction was erroneous, a party must "object to the instruction or in some way alert the district court to a potential error before submission to the jury." Lear v. Equitable Life Assurance Soc'y of United States, 798 F.2d 1128, 1133 (8th Cir. 1986), cert. denied, 479 U.S. 1066 (1987). However, a mere formal objection which does not "sufficiently bring into focus the precise nature of the alleged error," Christinson v. Big Stone County Co-Op, 13 F.3d 1178, 1181 (8th Cir. 1994), will not preserve the issue for appeal. Id. The rationale for this rule is clear: if the charge is indeed erroneous, it is far more efficient if the district court can correct this error at the charging phase, rather than having this Court order a new trial.

We conclude that Benham preserved this issue for appeal. When objecting to the jury instruction, Benham did complain to the district court that the instruction was vague. Although its objection was somewhat convoluted, we conclude that Benham did alert the district court to what it perceived to be error in the instruction. See id. (issue preserved for appeal when party alerts the district court to the nature of the error and gives the district court a chance to explain or amend the instruction).

contract.  It sets forth clearly each element of the cause of action. Benham does not dispute this.  Rather, Benham contends that the charge is vague because it does not distinguish among Maddox's four theories of breach.  However, "[w]here the charge to the jury correctly sets forth the law, a lack of perfect clarity will not render the charge erroneous."  Roth v. Black & Decker, U.S., Inc., 737 F.2d 779, 783 (8th Cir. 1984); see also Hastings, 975 F.2d at 510 ("we will not find error in instructions simply because they are . . . not a model of clarity"); Toro Co. v. R & R Prods. Co., 787 F.2d 1208, 1215 (8th Cir. 1986) (same).  Benham's contention fails.

### III.  Maddox's Cross-Appeal

In its cross-appeal, Maddox contends that the judge erred when he reduced the amount of damages awarded against Benham by $1,137,000, and against Dynalogic by $330,000, contending both that Maddox offered proof of damages and that the district court erred in not admitting evidence of the performance bond.  We agree with the district court that Maddox has not demonstrated evidence of actual damages, and we affirm the reduction in damages.

The district court's reduction of damages in this case is akin to a partial judgment as a matter of law on that one claim.  Although Maddox asserts that the district court's action is best viewed as a remittitur, which can only be granted when "the award is so excessive as to shock the court's conscience," Triton, ___ F.3d at ___, 1996 WL 288047, at *4, this ignores the substance of the district court's action.  The district court noted that its action was not a remittitur.  Rather, as the district court concluded, Maddox failed to offer sufficient proof as to one independent, readily identifiable quantum of damages.

When it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been

-19-

there, district courts possess the power to reduce the amount of the verdict accordingly.  See Hoover v. Valley West D M, 823 F.2d 227, 230 (8th Cir. 1987) (district court properly reduced verdict by $17,500 because plaintiff, as a matter of law, failed to prove damages on one independent issue); see also 6A J. Moore, Moore's Federal Practice, ¶ 59.08[7], at 59-201, 59-202 (2d ed. 1995) (when "there is no genuine factual issue as to the amount of recoverable damages . . . the court has the power to order judgment for the amount that is recoverable as a matter of law"); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2815, at 159 (2d ed. 1995) (same).  We review such a reduction of verdict as we would any other order granting judgment as a matter of law.  We will affirm the district court's order only if a reasonable jury, viewing the evidence in the light most favorable to the nonmovant and giving the nonmovant the benefit of all reasonable inferences, could not draw differing conclusions from the evidence.  See Abbott v. City of Crocker, Mo., 30 F.3d 994, 997 (8th Cir. 1994).

Under Missouri law, proof of actual damages is required for a party to recover for a breach of contract.  See U.S. Durum Milling, 785 F. Supp. at 1373 (analyzing Missouri law).  It is well settled that "'contingent, speculative, or merely possible [consequences] are not proper to be considered by the jury in ascertaining the damages, for it would be plainly unjust to compel one to pay damages for results that may or may not ensue . . . .'"  First Nat'l Bank v. Kansas City S. Ry., 865 S.W.2d 719, 739 (Mo. App. 1993) (quoting Hahn v. McDowell, 349 S.W.2d 479, 482 (Mo. App. 1961)).  To recover damages, a plaintiff must make more than just a showing that damages are "possible or even probable developments . . . ."  Thienes v. Harlin Fruit Co., 499 S.W.2d 223, 230 (Mo. App. 1973).

Maddox presented no evidence whatsoever that it actually reimbursed EEI for the sums expended by EEI.  Although Maddox

presented evidence that EEI looked to Maddox for reimbursement,[11] until Maddox actually reimbursed EEI, it has suffered no concrete damages. For example, should EEI have sued Maddox for these sums (rather than collecting on the performance bond), it is conceivable that Maddox could have interposed a successful defense against EEI and be adjudged not liable to EEI. Until Maddox has paid the costs or has been adjudged liable for these costs, any damages to Maddox are merely speculative and contingent, and hence not recoverable.

Maddox counters that, had it been able to introduce evidence of the performance bond, then there would have been sufficient evidence to enable the jury to conclude that Maddox had been damaged. This excluded evidence would have shown that USF&G paid $2.8 million to EEI to cover the added costs of repair, and that Maddox was contractually liable to reimburse USF&G. Although we will assume for the sake of argument that it was error to disallow this evidence, we believe that any possible error was harmless.

Maddox correctly notes that USF&G acted in the role of surety, and that Maddox was the indemnitor for USF&G. Under Missouri law, "an indemnitor of a surety compelled to satisfy the liability of a surety is subrogated to all rights to which the surety would have been subrogated." Westerhold v. Carroll, 419 S.W.2d 73, 76 (Mo. 1967). Thus, Maddox argues that it can maintain a suit against

---

[11]Dean Bafford of EEI testified extensively as to cost to EEI to repair defective equipment supplied to it under the contract with Maddox. Bafford listed each piece of defective equipment and the repair cost for each item. Later in his testimony, Bafford noted that EEI looked to Maddox to rectify any errors in the contract; presumably, EEI looked to Maddox to reimburse EEI for its expenditures. For example, Bafford testified that "[w]hen a failure occurred . . . we went to C.L. Maddox to remedy that." 8 Trial Tr. at 98. He also noted that, regardless of whose fault the problem was, EEI looked to Maddox to remedy the situation. Id. at 125. This sentiment was echoed by Robert Powers, a vice-president of EEI, who noted that EEI held Maddox "accountable to assure that those concerns . . . turned out to be resolved." 9 Trial Tr. at 181.

Benham and Dynalogic because it is subrogated to all of the rights held by USF&G, which had actually paid the repair costs.

Maddox misinterprets Missouri law. Although it has correctly quoted Westerhold, it ignores one important fact of that case: the indemnitor had already paid the surety, which is why subrogation was permitted. Id. This is in accord with the long-established rule that the right of subrogation does not accrue until the party seeking subrogation has paid the underlying claim. See Liberty Mut. Ins. Co. v. Mercantile Home Bank & Trust Co., 241 S.W.2d 493, 496 (Mo. App. 1951); see also 73 Am. Jur. 2d Subrogation §§ 26, 30 (2d ed. 1974 & Supp. 1996); 83 C.J.S. Subrogation § 11 (1953 & Supp. 1995) ("[t]he rights of a subrogee attach at the time . . . he pays the debt").

In this case, Maddox has offered no evidence that it has reimbursed USF&G for the sums it expended. The evidence excluded by the district court would not have established this either, because the offer of proof would only have shown that USF&G considered Maddox to be liable, and not that Maddox had been adjudged liable or actually paid the debt. See 6 Trial Tr. at 11-14. Therefore, even had the district court admitted the evidence, Maddox would not have been able to demonstrate that it suffered concrete damages. The district court correctly granted the reduction in verdict.

## IV. CONCLUSION

We agree with the district court that the jury's award of $2,746,717.98 in damages to Maddox had support in the evidence. We further agree that the overall judgment against Benham was properly reduced by $1,137,000, and the judgment against Dynalogic was properly reduced by $330,000, because Maddox did not offer evidence that it was damaged when EEI had to expend money to repair defective equipment. However, we disagree with the district court

that Benham had contractually shifted to itself the risk that Maddox would act deficiently, and we reduce the award against Benham by $1,267,367.02. As a result, Benham still stands liable to Maddox in the amount of $2,746,717.98, and Dynalogic is not liable to Maddox.

    A true copy.

        Attest:

            CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.