**HALLS FERRY INVESTMENTS, INC., Plaintiff/Counterclaim Defendant/ Respondent,**

**v.**

**Elmo SMITH, et al., Defendants/Counterclaim Plaintiffs/ Appellants.**

No. 73596.

Missouri Court of Appeals, Eastern District, Division One.

Dec. 8, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 18, 1999.

Application for Transfer Denied March 23, 1999.

Bruce C. Oetter, Elizabeth Carver, Jennifer Arthur, St. Louis, for appellants.

Gary Mayes, Jeffrey Fink, James Erwin, St. Louis, for respondent.

WILLIAM H. CRANDALL, Jr., Judge.

Defendants, Elmo Smith, et al., appeal from the grant of summary judgment in favor of plaintiff, Halls Ferry Investments, Inc., in plaintiff's action seeking a declaration of its rights and duties under a lease and on defendants' counterclaim for damages for plaintiff's breach of that lease. We affirm.

Defendants, Elmo Smith, Anna E. Smith, A.B.K., Inc., Victor M. Huddleston, Blanche I. Huddleston, Charles E. Huddleston, Barbara Ann Huddleston, and R.Q. & L., Inc. (hereinafter Owners), were owners [1] of more

---

1. Defendants sold the property in February 1997, but specifically reserved any and all causes of action against Halls Ferry arising from the lease. We refer to defendants as "Owners" throughout

than 100 acres of land in North St. Louis County (hereinafter property). Plaintiff, Halls Ferry Investments, Inc. (hereinafter Halls Ferry), was a corporation formed by the Zykan family for the sole purpose of leasing 62 acres of the property, an abandoned quarry, for the development and operation of a landfill. The Zykans also owned a trash hauling business known as Zykan Bothers, Inc.

On February 29, 1984, Halls Ferry and Owners entered into a lease on the property. Section 1.2 of the lease provided that Halls Ferry use the property only as a "sanitary landfill" in compliance with the permits granted by St. Louis County and the Missouri Department of Natural Resources (hereinafter DNR). Section 1.8 of the lease granted Halls Ferry the following right:

> [T]he right, but not the obligation, to construct, install and locate within the Demised Premises [property] such roads, equipment, machinery, buildings, water and sewer lines ("Improvements") and any and all similar Improvements necessary in the sole opinion of Lessee [Halls Ferry] to carry on the business of a sanitary landfill within the Demised Premises [property].

Section 2.1 of the lease provided that the term of the lease would start on February 29, 1984, "and shall terminate on the date of the permanent closing of the landfill in accordance with the regulations of the State of Missouri . . . ("DNR")."

Section 3 of the lease addressed plaintiff's rental obligations. Rental payments commenced after Halls Ferry opened the landfill to receive solid waste for disposal. Each year thereafter, Halls Ferry was required to pay the greater of $20,000.00 "minimum annual payment" or an amount based on the volume of waste deposited in the landfill. The formula for calculating the amount based on volume was 16 and 21 cents per cubic yard during the first and second years, respectively; and then 10 percent of the gross dollar volume for dumping fees during the third year "and each year thereafter until the Demised Premises is filled or

the landfill is closed under the regulations of DNR."

In December 1986, the Zykans sold their stock in Halls Ferry to Browning–Ferris Industries of St. Louis, Inc. (hereinafter BFI). The only asset BFI acquired was Halls Ferry's interest in the lease with Owners. In a related transaction BFI acquired the Zykans' waste disposal business.

In February 1986, Halls Ferry applied to DNR for a permit and submitted an engineering plan. The engineering plan contained a closure plan which provided that after the landfill was filled to capacity with waste, it would be covered with a layer of soil which would be seeded. DNR approved Halls Ferry's application and issued an operating permit for the sanitary landfill. In August 1988, Halls Ferry opened the landfill for operation. Although small quantities of solid waste were deposited initially in the landfill, no significant volume of waste was deposited after 1989. The last payment to Owners based on volume of waste deposited in the landfill was on May 14, 1989. Thereafter, Halls Ferry paid Owners the minimum annual rental of $20,000.00.

Early in 1994, Halls Ferry terminated operation of the landfill. Halls Ferry submitted a decommissioning and closing plan for the landfill to DNR. On August 29, 1994, DNR approved the plan. Halls Ferry then removed the waste and liner and left the property in its original condition. In July 1996, DNR approved the measures taken by Halls Ferry and voided the operating permit for the landfill. In a letter dated November 26, 1996, DNR informed Halls Ferry that it had determined that the landfill had been "properly closed."

In April 1995, Halls Ferry brought this declaratory judgment action, seeking a declaration that its obligations under the lease would terminate when the landfill was decommissioned and closed sometime thereafter. Owners counterclaimed, seeking damages for Halls Ferry's failure to operate the landfill and to pay royalties and also for the

this opinion for ease of understanding and because that was their status at the time pertinent

to this litigation.

diminution in the value of the property as a result of having an empty hole at the end of the lease. They alleged that the landfill was not closed until it was completely filled with solid waste and covered with soil, as proposed in the original engineering plans submitted to DNR. The parties filed cross-motions for summary judgment on Halls Ferry's claim as well as on Owners' counterclaim. The court denied Owners' summary judgment motions, finding there were no express or implied covenants in the lease to operate the landfill. The trial court later granted Halls Ferry's motions for summary judgment on its claim and on Owners' counterclaim, finding that the lease term "permanent closing" was not ambiguous and that the lease terminated when the landfill permanently closed and DNR revoked the permit to operate.

Initially, we set forth the standard of review of a summary judgment. The propriety of summary judgment is purely an issue of law. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Accordingly, the standard of review on appeal regarding summary judgment is no different from that which should be employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* Summary judgment is designed to permit the trial court to enter judgment, without delay, where the moving party has demonstrated a right to judgment as a matter of law. *Id.* Summary judgment is particularly appropriate if the issue to be resolved is the construction of a contract that is unambiguous on its face. *Daniels Exp. and Transfer Co. v. GMI Corp.*, 897 S.W.2d 90, 91–92 (Mo.App. E.D. 1995).

In their first point, Owners argue the trial court erred in granting summary judgment in favor of Halls Ferry in the declaratory judgment action because there was no "permanent closing" of the landfill under the clear meaning of the lease, such that the lease terminated by its own terms.

■ The obligation to perform under a contract is measured by the intention of the parties as gathered from the object, nature, and purpose of the agreement, as well as from the terms of the lease as a whole, not merely from a solitary provision. *McKnight v. Midwest Eye Institute of Kansas City, Inc.*, 799 S.W.2d 909, 913 (Mo.App.1990). Laws in existence at the time and place of making a contract, which affect its validity, construction, enforcement, termination and discharge, become part of the contract as if they were expressly referred to or incorporated therein. *Sharp v. Interstate Motor Freight System*, 442 S.W.2d 939, 945 (Mo. banc 1969).

■ Section 2.1 of the lease provided: "The term of this lease shall start on the 29 th day of February, 1984 and *shall terminate on the date of the permanent closing of the landfill in accordance with the regulations* of the State of Missouri Department of Natural Resources ("DNR")." (Emphasis added). Here, Halls Ferry removed the small quantity of solid waste that had been deposited in the landfill and discontinued its operation. The DNR expressly determined the landfill was properly closed and revoked the operating permit for the landfill. Thus, in accordance with the plain language of the lease, the landfill was "permanently closed."

In addition, the closing was "in accordance with the regulations" of DNR in effect at the time the parties entered into the lease. 10 CSR 80–2.030 addressed the closing of landfills and provided as follows:

(1) To prevent a solid waste disposal area from being a blight on the land, a hazard to health and safety and air pollution problem or a source of pollution to any water course, the owner/operator of any solid waste disposal area that is closed or discontinued after June 30, 1973, shall obtain approval of the method of closure from the department prior to closing.

(2) No person may excavate, disrupt, or remove any deposited material from any active or discontinued solid waste disposal area without having received prior approval from the department. Requests for approval shall include an operational plan stating the area involved, lines and grade defining limits of excavation, estimated number of cu-

bic yards and type of material to be excavated, location where excavated material is to be deposited, type equipment to be used to transport material, estimated time required for excavation and disposal procedures and provisions for closing the excavated or disrupted area(s).

This regulation set forth the appropriate method to close or discontinue a landfill and required DNR approval of a closure plan as a prerequisite to closing a landfill.

Here, Halls Ferry submitted a plan setting forth the procedures for closing the landfill to DNR in accordance with DNR's regulations. DNR approved the proposed plan. After Halls Ferry completed the removal of the waste, DNR sanctioned the measures taken by Halls Ferry and voided the operating permit for the landfill. Sometime thereafter, DNR informed Halls Ferry by letter that it had determined that the landfill had been "properly closed."

Thus, the landfill was permanently closed in compliance with the regulations of DNR. Under the terms of the lease, the lease terminated. Owners' first point is denied.

In their second point, Owners contend the court erred in entering summary judgment in favor of Halls Ferry because if the terms of the lease were found to be ambiguous, there was sufficient extrinsic evidence of the intended meaning of those terms. Owners focus on the parties' alleged statements, discussions, representations, negotiations, among other things, regarding the interpretation of the phrase "permanent closing" and Halls Ferry's obligation to pay royalties based upon the volume of solid waste deposited in the landfill.

To give construction to an ambiguous contract that reflects the intent of the parties, the court can consider extrinsic or parole evidence, including the execution of the contract and the interpretation given to the contract by the parties. *Wynn v. Wynn*, 738 S.W.2d 915, 918 (Mo.App.1987). Where the contract is not ambiguous, however, the intent of the parties is determined from the contract alone. *Morgan v. City of Rolla*, 947 S.W.2d 837, 841 (Mo.App. S.D.1997).

In the instant action, the trial court found the lease was not ambiguous. Whether the lease was ambiguous was a question of law. *See Young Dental Mfg. Co. v. Engineered Products, Inc.*, 838 S.W.2d 154, 155–156 (Mo.App. E.D.1992). The fact that the parties disagreed as to the meaning of its terms did not render the lease ambiguous. *Id.* In view of the trial court's finding that the lease was not ambiguous, it was not necessary for the court to resort to extrinsic evidence to determine the meaning of the lease. Owners' second point is denied.

In their third point, Owners contend the trial court improperly granted summary judgment on their counterclaim because there was an implied covenant in the lease to operate and fill the landfill. Owners again rely on extrinsic evidence of statements made by Halls Ferry regarding its intent to operate and fill the landfill.

Implied obligations must rest entirely upon the presumed intentions of the parties, as gathered from the terms actually expressed in the lease itself. *Birdsong v. Bydalek*, 953 S.W.2d 103, 118 (Mo.App. S.D. 1997) (citing *Conservative Federal Sav. & Loan Ass'n. v. Warnecke*, 324 S.W.2d 471, 478–479 (Mo.App.1959)). A covenant will not be implied in order to make an agreement fair and reasonable. *Id.*

In an action brought by a retail tenant in *Michigan Sporting Goods Distributors, Inc. v. Lipton Kenrick Assoc., L.P.*, 927 S.W.2d 570 (Mo.App. E.D.1996), this court declined to recognize an implied covenant in a lease that landlord provide and operate a retail shopping center leased primarily to retail tenants. This court stated:

The lease makes numerous references to the existence of a shopping center at Kenrick Plaza. However, the lease does not unambiguously place a duty on defendant to ensure the existence of such a shopping center. Nor is there any expressed or implied requirement that a certain level of tenancy or a specific number or percentage of retail stores be maintained in the shopping center. Furthermore, there is no ambiguous language that is reasonably sus-

ceptible to a construction which would place such a duty on defendant.

*Id.* at 573.

Likewise, the language of the lease before us did not unambiguously impose an obligation upon Halls Ferry either to operate a landfill or to fill it to capacity before closing it. There was no expressed or implied requirement that Halls Ferry do so. There was no ambiguous language that could reasonably be interpreted to place such a duty on Halls Ferry. While the lease failed to state that no such obligation existed, an ambiguity cannot be created by silence, especially when both parties are sophisticated bargainers. *See id.*

In addition, Section 1.8 of the lease expressly relieved Halls Ferry of any obligation to construct certain improvements to the property to carry on the business of a landfill. Absent these improvements to the property, it would be difficult to operate a landfill. It can be implied from this provision that Halls Ferry was under no duty to operate a landfill.

Even if Halls Ferry told owners it intended to operate and fill the landfill, such representations did not create a duty to do so. Section 21.1 of the lease contained an integration clause. The clause stated that the lease "contains the entire agreement of the parties" and any modifications to the lease must be signed in writing by the parties. Therefore, any representations made by Halls Ferry regarding its intention to operate a landfill on the property were not integrated into the lease and had no binding effect on Halls Ferry. *See id.* Owners' third point is denied.

In their fourth point, Owners claim summary judgment was improper because Halls Ferry was estopped to deny the existence of a duty to operate and fill the landfill because of representations to Owners that it intended to fill the landfill before the lease terminated and Owners relied on these statements to their detriment.

To recover on the basis of promissory estoppel there must have been (1) a promise, (2) on which the party seeking to recover relied to his or her detriment, (3) in a way the person making the promise expected or should have expected, and (4) the reliance resulted in an injustice which can be cured only by enforcement of the promise. *Hamra v. Magna Group, Inc.,* 956 S.W.2d 934, 939 (Mo.App. S.D.1997). The remedy of promissory estoppel is not available, however, when an unambiguous contract exists that covers the issue for which damages are sought. *Id.* Promissory estoppel cannot be used to create rights not included within the contract. *Id.*

In the instant action, the trial court found that the lease was unambiguous. Promissory estoppel cannot be used to engraft a promise on the lease that is different from the written terms of the lease. *See id.* Point four is denied.

In their fifth point, Owners assert the trial court erred in granting summary judgment in favor of Halls Ferry because Halls Ferry breached its implied duty of good faith and fair dealing in the lease by diverting waste from the landfill to another landfill, by failing to operate the landfill, by misleading Owners about its intention to operate the landfill, and by abandoning the landfill.

As written, Owners' fifth point does not claim a breach of the general duties of good faith and fair dealing, but rather asserts breaches of specific implied contractual obligations. *See, e.g., Birdsong,* 953 S.W.2d at 120. As stated previously in this opinion, we found no implied covenants to do more than was required by the terms of the lease. Owners' fifth point is denied.

The judgment of the trial court is affirmed.

JAMES A. PUDLOWSKI, P.J. and CLIFFORD H. AHRENS, J., concur.