# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

_____

Nos. 00-3873 and 00-3877

_____

| | | |
|---|---|---|
| CLEARLY CANADIAN<br>BEVERAGE CORPORATION, | * | |
| | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| AMERICAN WINERY, INC. d/b/a | * | Appeal from the United States |
| BEVERAGE CONCEPTS, and | * | District Court for the |
| HIGHLAND COMMUNITY BANK, | * | Eastern District of Missouri. |
| | * | |
| Appellants, | * | [PUBLISHED] |

_____

No. 00-3876

_____

| | | |
|---|---|---|
| TIMOTHY J. RAND, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| CLEARLY CANADIAN | * | |
| BEVERAGE CORPORATION, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:   June 14, 2001
Filed:   July 30, 2001

_____

Before MORRIS SHEPPARD ARNOLD and RICHARD S. ARNOLD, Circuit Judges, and BATAILLON,[1] District Judge.

_____

BATAILLON, District Judge.

When one company's fortunes take a turn for the worse, entities with whom it contracts are often adversely affected. However, the degree to which an entity is adversely affected will usually depend upon the contractual safeguards bargained for and secured by the entity.

Following a precipitous decline in demand for its product, Clearly Canadian Beverage Corporation ("Clearly Canadian") filed suit in federal district court against American Winery, Inc. ("American Winery") seeking recovery on a promissory note as well as replevin of certain equipment which secured the note. Clearly Canadian amended its complaint, joining Highland Community Bank ("the Bank") as a defendant and requesting a declaratory judgment that its security interest in American Winery's collateral was superior to the security interest of the Bank in the same collateral. American Winery filed counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, and negligent and fraudulent misrepresentation.

Timothy Rand ("Rand"), one of the owners of American Winery, filed a separate action in Missouri state court against Clearly Canadian for fraudulent and negligent misrepresentation. Rand's suit was timely removed to federal court and consolidated with Clearly Canadian's pending federal action against American Winery and the Bank.

Clearly Canadian, American Winery and Rand submitted a series of summary judgment motions, all of which were decided by the district court in favor of Clearly

_____

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska, sitting by designation.

Canadian. The district court entered a Final Judgment and Order of Replevin, entering judgment in favor of Clearly Canadian on all its claims, dismissing American Winery's counterclaims and Rand's claims with prejudice, and ordering that Clearly Canadian was entitled to immediately replevy the collateral of American Winery. American Winery, Rand, and the Bank appeal, and we affirm in part.

## I. FACTUAL BACKGROUND

Beginning in 1987, Clearly Canadian, a publicly traded company based in Vancouver, Canada, began to produce, distribute, and market bottled beverages, including flavored carbonated bottled water marketed under the trademark "Clearly Canadian®." Clearly Canadian contracted with distributors and "licensees" (i.e., distributors that also have approved production capabilities) to get its products to retail markets. Clearly Canadian also entered into arrangements with bottlers, also called "co-packers," to produce its products for Clearly Canadian to supply to its distributors. In 1989, Clearly Canadian entered into a non-exclusive bottling agreement with American Winery, a bottling facility whose principal place of business is St. Louis, Missouri.

### A. Clearly Canadian's Loans to American Winery

When Clearly Canadian entered into the bottling agreement with American Winery in 1989, Clearly Canadian advanced funds to American Winery for certain capital improvements. The purpose of these capital improvements was to allow American Winery to produce Clearly Canadian products in greater volume. Although American Winery was to repay these advances through a $0.05 per case reduction in the fees Clearly Canadian would owe American Winery for bottling services, the bottling agreement did not require Clearly Canadian to order any specific minimum volume of production from American Winery. Clearly Canadian had similar arrangements with numerous other co-packers at the time.

3

In 1991, because of adverse financial circumstances, American Winery planned for and filed a Chapter 11 bankruptcy reorganization proceeding. Prior to this filing, the parties had discussed the possibility of Clearly Canadian advancing additional funds to American Winery to facilitate its reorganization. On March 13, 1991, Clearly Canadian entered into a Credit Agreement to advance American Winery funds through two separate loans: a Facility A loan and a Facility B loan.

Under the Facility A loan, Clearly Canadian would make term loans to American Winery in an aggregate amount not to exceed $661,000 so that American Winery could increase its production capacity to meet Clearly Canadian's burgeoning production demands. The parties agreed that American Winery could repay the Facility A loan through the $0.05 per case credit repayment feature established in their original bottling agreement.

Under the Facility B loan, Clearly Canadian would advance working capital equal to $0.20 per case of Clearly Canadian products bottled by American Winery. The Facility A Loans were evidenced by a promissory note entitled "Facility A Note," and the Facility B Loans were evidenced by a promissory note entitled "Facility B Note." The bankruptcy court approved these arrangements. None of the agreements entered into between Clearly Canadian and American Winery on March 13, 1991, required Clearly Canadian to order any particular volume of production from American Winery.

In 1992, Clearly Canadian advanced an additional $650,000 to further increase American Winery's capacity to bottle Clearly Canadian beverages. American Winery used these funds to convert a non-functioning canning line at American Winery's plant into a fully functioning bottling line dedicated solely to Clearly Canadian production. Before this loan, the advances made to American Winery totaled $414,981 under the Facility A loan and $985,678 under the Facility B loan. After all of the loan advances had been made, the parties agreed in the summer of 1992 that all of the loans would be

combined and redocumented in the form of an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), effective May 31, 1992.

In connection with the Amended Credit Agreement, American Winery also executed a promissory note in which American Winery promised to pay to Clearly Canadian, on or before the "Facility Termination Date," the principal sum of $2,450,000 or, if less, the unpaid principal amount of the loan, plus interest as specified in the Agreement (the "Promissory Note"). The "Facility Termination Date" was defined in the Amended Credit Agreement as follows: "Facility Termination Date shall mean the earlier to occur of (i) May 31, 1994, and (ii) the date on which the Liabilities shall become due in accordance with Section 9.2." Section 4 of the Amended Credit Agreement provided, "The Loan shall mature and be payable in full on the Facility Termination Date."

Under section 4 of the Amended Credit Agreement, American Winery was required to make mandatory payments to Clearly Canadian prior to the Promissory Note's maturity date of May 31, 1994, in the form of a credit of five cents per case of product produced by American Winery, plus payments from any "Available Funds," as defined in the Amended Credit Agreement, in excess of $500,000. The five cent prepayments per case were offset against amounts Clearly Canadian owed American Winery for bottling its products. American Winery never made any lump sum payments from "Available Funds."

The Amended Credit Agreement further provided that American Winery was to develop a Business Plan using data supplied by Clearly Canadian. Section 1.1 of the Amended Credit Agreement defined the term "Business Plan" as follows:

> Business Plan means the projections for the period from the date hereof through May 31, 1994 prepared by Borrower and delivered to Lender prior to the date hereof, including the assumptions used in preparing such projections, provided that such projections may be amended and supplemented . . . by agreement of Borrower and Lender if the volume of

5

production required (or anticipated to be required) by Lender is different from the volume assumed to be required in such projections.

American Winery warranted that "absent circumstances beyond [its] control, [American Winery] expects to be able to achieve the production levels with respect to Cases of Lender's Product specified in the Business Plan." Likewise, American Winery covenanted that it would "use its best efforts to achieve the levels of production of Cases of Lender's Product specified in the Business Plan."

Neither the Amended Credit Agreement nor the Promissory Note contains any provision expressly requiring Clearly Canadian to order any particular volume of production from American Winery. In addition, neither the Amended Credit Agreement nor the Promissory Note provides that American Winery's payment of unpaid principal and interest on the loan was to be based solely on the volume of production produced by American Winery for Clearly Canadian or limited to five cents per case of product produced.

## B. Clearly Canadian's Business Operations

In 1991, Clearly Canadian expected that demand for its products would continue to increase. To meet this demand, Clearly Canadian attempted to locate additional bottling capacity by expanding its production network. To that end, Clearly Canadian entered into relationships with additional co-packers between April 1991 and February 1992. American Winery was aware that Clearly Canadian was entering into new relationships with different co-packers.

None of the relationships Clearly Canadian entered into with co-packers was exclusive. Some co-packers, however, negotiated "take or pay" provisions in their agreements with Clearly Canadian, pursuant to which Clearly Canadian agreed to bottle a specified minimum amount of product with the co-packer. American Winery's

agreement with Clearly Canadian did not expressly contain such an obligation on the part of Clearly Canadian.

As Clearly Canadian's production network expanded and it entered into relationships with more co-packers, its ability to service its distributors improved. Because it began using co-packers in more areas of the United States and Canada, Clearly Canadian became able to provide its product to its distributors from co-packers who were geographically closer to each distributor. Logistical and efficiency concerns at times led to changing the co-packer that filled orders for a given distributor. The reallocation of production among co-packers was permissible under Clearly Canadian's agreements with its co-packers.

During 1991 and early 1992, Clearly Canadian did not have sufficient capacity from its existing co-packers to meet anticipated demand for its product. As of early 1992, American Winery was producing Clearly Canadian product at maximum capacity. In addition to expanding its production network and entering into relationships with additional co-packers to meet the current and anticipated demand, Clearly Canadian made every effort to obtain the maximum production available from its existing co-packers, including American Winery. Accordingly, Clearly Canadian sought assurances from American Winery that it could provide specific volumes of production capacity to help meet Clearly Canadian's anticipated demand.

Not only did Richard Gibson, American Winery's Plant Manager, and Dwight Roscoe, Clearly Canadian's Director of Materials & Distribution, have conversations in early 1992 about production capacity, Clearly Canadian sent correspondence on the subject as well. In a letter dated February 14, 1992, Roscoe wrote to American Winery in reference to American Winery's "Proposed 1992 Production Forecast." In that letter, Roscoe asked American Winery to commit to its capacity to produce Clearly Canadian's "requirements" -- specific numbers of cases that Clearly Canadian desired American Winery to provide on a monthly basis in 1992. Clearly Canadian's

requirements for capacity from American Winery were restated in Roscoe's letter dated March 6, 1992. In his March 6, 1992, letter, Roscoe informed American Winery that the projections were "minimum requirements for production in the months stated" and requested that American Winery exert "every effort available to meet the requirements of Clearly Canadian." The volume amounts stated in Roscoe's letters were ultimately incorporated into the "Business Plan" referenced in the Amended Credit Agreement.

At the time these discussions were pending regarding American Winery's capacity to meet Clearly Canadian's projected volume requirements, Clearly Canadian believed that demand for its product would continue to increase. The demand for Clearly Canadian product dramatically increased from 1991 to late 1992, at which time demand abruptly abated. From sales of fewer than 600,000 cases in 1988, demand increased to more than 18,000,000 cases in 1991, and to almost 23,000,000 cases in 1992. In 1993, however, sales plummeted to fewer than 15,000,000 cases. The impact of this downturn was exacerbated by the fact that Clearly Canadian had projected an increase in demand during 1993.

As the demand for its product decreased, Clearly Canadian's demand for capacity from its co-packers fell precipitously. Clearly Canadian reduced its production orders from 1992 and 1993 substantially below the levels contemplated by the Business Plan. The 1992 Business Plan levels were 8,027,626 cases in 1992 and 10,500,000 cases in 1993. However, Clearly Canadian only placed orders for 6,699,269 cases in 1992 – 82.4% of the 1992 case volume in the Business Plan. In 1993, Clearly Canadian placed orders for only 1,823,085 cases – 17.36% of the 1993 case volume in the Business Plan.

## C. Clearly Canadian's Offers To Purchase American Winery

The dramatic downturn in Clearly Canadian's business from 1993 forward adversely affected Clearly Canadian and all companies with which it did business,

including American Winery. The Facility Termination Date of May 31, 1994, came without American Winery paying the amount due to Clearly Canadian. As American Winery's financial condition worsened, American Winery and Clearly Canadian began looking for ways to alleviate the problem. Clearly Canadian was concerned about repayment of its $2.4 million loan to American Winery. Clearly Canadian's Stuart Ross and American Winery's Timothy Rand had a number of discussions regarding the future of American Winery, as well as repayment of Clearly Canadian's loan to American Winery. Some of these discussions concerned the possibility of Clearly Canadian purchasing American Winery so long as Rand insured that American Winery remained solvent and a going concern. In view of these discussions, Rand invested nearly $2.4 million of his personal funds in order to keep American Winery viable for purchase by Clearly Canadian.

Clearly Canadian made three separate offers to acquire American Winery. The first offer was for $500,000 and occurred at some unidentified time. The second offer was for $600,000 and occurred in August 1996 when Rand received a written proposal from Ross concerning an asset purchase of American Winery, paying off the bank debt, and assuming the Clearly Canadian debt and the lease obligations. Clearly Canadian made a third offer in March 1997 to purchase American Winery for $850,000. Rand rejected all three of Clearly Canadian's offers. In June 1997, Clearly Canadian demanded that American Winery make immediate payment of the outstanding principal balance of the loan, all interest accrued thereon and all other Liabilities (as defined in the Amended Credit Agreement). American Winery did not pay the amount due.

## D. Clearly Canadian's Security Interest in American Winery's Property

The Bank first loaned money to American Winery in 1985 for the purchase of a bottling plant in St. Louis. The initial loan was secured by a lien on all of American Winery's assets, including its existing and after-acquired equipment. In 1988,

American Winery refinanced the 1985 loan and the Bank extended additional credit to American Winery, increasing American Winery's total indebtedness to $400,000. In exchange, the Bank was granted a blanket security interest in American Winery's property, including all of its current and after-acquired equipment. In September 1990, the Bank loaned an additional $880,000 to American Winery which was secured by the same collateral securing the 1988 loan.

Clearly Canadian obtained a security interest in certain American Winery assets in 1991. Pursuant to the Credit Agreement, Clearly Canadian received a security interest in American Winery's assets described as follows in Section 5.1 of the Credit Agreement:

> all equipment, spare parts, supplies and other goods acquired with the proceeds of [Clearly Canadian's] Facility A Loans (it being understood and agreed that all equipment, spare parts, supplies and other goods acquired by the Borrower after the date hereof shall be deemed to have been acquired with proceeds of the Facility A Loans absent a final and conclusive finding by the Bankruptcy Court to the contrary), and all attachments, substitutions, replacements and improvements thereto and therefor . . ., all general intangibles relating thereto . . . and all proceeds and products of all of the foregoing. . . .

On March 22, 1991, American Winery filed a voluntary petition for reorganization under Chapter 11 in the United States Bankruptcy Court. As part of the restructuring, the bankruptcy court approved the Credit Agreement, and entered an order granting Clearly Canadian a security interest in all "equipment, spare parts, supplies and other goods acquired with the proceeds of [Clearly Canadian's] Facility A Loans. . . ."

In May 1992, Clearly Canadian and American Winery entered into an Amended Credit Agreement. The Amended Credit Agreement purported to provide Clearly Canadian with a security interest extending to virtually all of American Winery's

10

property, except for certain property that had already been purchased with the Bank's money. Specifically, the security interest is described in Section 5.1 of the Amended Credit Agreement as extending to:

> (i) all of [American Winery's] equipment, spare parts, and supplies, excluding the Bank Equipment, (ii) all other goods acquired with proceeds of the Loan, (iii) all attachments, substitutions, replacements and improvements for any of the foregoing, (iv) all general intangibles relating to any of the foregoing (including without limitation all warranty claims and insurance contracts with respect thereto), and (v) all proceeds and products of all the foregoing. . . .

The Bank Equipment described in the Agreement included all equipment as to which the Bank had a valid security interest that was perfected before confirmation of American Winery's reorganization plan. In effect, therefore, the Amended Credit Agreement granted Clearly Canadian a security interest in a broad range of American Winery equipment (with the exception of the narrowly defined Bank Equipment) beyond that equipment which had been purchased with the proceeds of Clearly Canadian's loans.

The Bank executed a "Waiver of Interest" on July 28, 1992. Through this document, the Bank expressly waived any interest it might have in American Winery's:

> (i) equipment, spare parts, supplies and other goods acquired with the proceeds of loans made to Debtor by [Clearly Canadian] (hereafter the "Clearly Related Equipment", which excludes, however, any equipment, spare parts or supplies as to which Bank had a valid, perfected security interest upon confirmation of Debtor's plan of reorganization as filed in the United States Bankruptcy Court . . .); (ii) all attachments, substitutions, replacements and improvements for any of the Clearly Related Equipment; (iii) all warranty claims, insurance contracts and other general intangibles relating to the foregoing; and (iv) all products and proceeds of the foregoing.

## II. ANALYSIS

We review the district court's award of summary judgment de novo. <u>See</u> <u>Gentry</u> <u>v. Georgia-Pacific Corp.</u>, 250 F.3d 646, 649 (8th Cir. 2001). The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Land v. Washington County, Minn.</u>, 243 F.3d 1093, 1095 (8th Cir. 2001). "One of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses and the rule should be interpreted in a way that allows it to accomplish this purpose." <u>Prudential Ins. Co. v.</u> <u>Hinkel</u>, 121 F.3d 364, 366 (8th Cir. 1997) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)). The parties agree that Missouri law applies in this diversity action.

## A. Clearly Canadian's Claim on American Winery's Note/American Winery's Counterclaim for Breach of Contract

Arguing that Clearly Canadian was contractually obligated to order a minimum number of cases of production from it, American Winery asserts that the district court erred in granting summary judgment in favor of Clearly Canadian both on Clearly Canadian's claim on American Winery's Note and on American Winery's counterclaim for breach of contract.

American Winery first contends that Section 1.1 of the Amended Credit Agreement bound Clearly Canadian to order the amount of production specified in the Business Plan. Section 1.1 of the Amended Credit Agreement contained the following definitional statement:

Business Plan means the projections for the period from the date hereof through May 31, 1994 prepared by Borrower and delivered to Lender prior to the date hereof, including the assumptions used in preparing such projections, provided that such projections may be amended and supplemented . . . by agreement of Borrower and Lender if the volume of production required (or anticipated to be required) by Lender is different from the volume assumed to be required in such projections.

American Winery claims that this provision obligated Clearly Canadian to order the amount of production projected in the Business Plan unless American Winery expressly consented to a change in the projections.

We disagree. The cooperative preparation of projections between vendor and vendee is a normal function of business. Section 1.1 confirms the cooperative nature of that endeavor by a plain statement that the Business Plan projections could not be amended without the agreement of American Winery. Section 1.1 does not purport to obligate Clearly Canadian to actually order production from American Winery in an amount equal to the Business Plan projections. Nor is there any ambiguous language[2] that reasonably could be interpreted to place such a duty on Clearly Canadian. See Halls Ferry Inv., Inc. v. Smith, 985 S.W.2d 848, 853 (Mo. Ct. App. 1998) ("While the lease failed to state that no such obligation existed, an ambiguity cannot be created by silence, especially when both parties are sophisticated bargainers.").

Notwithstanding Section 1.1's plain language, American Winery argues that such a construction would effectively render the provision meaningless. American Winery

---

[2] "A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable [persons] may fairly and honestly differ in their construction of the terms. If there is no ambiguity, the court need not resort to construction of the contract, but rather the intent of the parties is determined from the four corners of the contract." Eisenberg v. Redd, 38 S.W.3d 409, 411 (Mo. 2001) (en banc) (alteration in original; citations and quotation marks omitted).

13

correctly notes that a construction that renders a provision without meaning is to be avoided where another reasonable construction exists. See JEP Enter., Inc. v. Wehrenberg, 42 S.W.3d 773, 776 (Mo. Ct. App. 2001) ("A construction attributing a reasonable meaning to each phrase and clause, and harmonizing all provisions of the agreement is . . . preferred to one that leaves some of the provisions without function or sense."). Because parties rarely include meaningless provisions in their contracts, this rule of construction is really a corollary to the "cardinal rule" that a court "is to determine the intention of the parties and to give effect to that intention." In re Marriage of Thompson, 27 S.W.3d 502, 506 (Mo. Ct. App. 2000). However, a court should not attempt to impose a meaning on a provision that may not be borne by the plain language of the provision. Cf. Peet v. Randolph, 33 S.W.3d 614, 618 (Mo. Ct. App. 2001) ("It is presumed the parties' intent is expressed by the natural and ordinary meaning of the language in the contract.").

If American Winery had desired to assure itself that Clearly Canadian would actually order production in an amount equal to the Business Plan projections, American Winery could have so bargained. Indeed, other Clearly Canadian co-packers did negotiate "take or pay" provisions in their agreements with Clearly Canadian, pursuant to which Clearly Canadian agreed to bottle a specified minimum amount of product with the co-packer. This court will not construe an unambiguous contract to contain a "take or pay" provision where the parties chose not to include such a provision.

American Winery next contends that even if Clearly Canadian did not bind itself in Section 1.1 to order production from American Winery in an amount equal to the Business Plan projections, Clearly Canadian did so obligate itself through its correspondence with American Winery in 1992. However, it is well established that

> [e]xtrinsic evidence of a prior or contemporaneous agreement is generally
> not admissible to vary, add to, or contradict the terms of an unambiguous

14

and complete written document, nor may such parol evidence be used to create ambiguity in an otherwise unambiguous document. The parol evidence rule is a rule of substantive law and not a mere rule of evidence. Evidence offered in violation of it must be ignored. The law conclusively presumes all prior and contemporaneous agreements have been merged into an unambiguous written contract, which becomes the final memorial of the agreement.

Union Elec. Co. v. Fundways, Ltd., 886 S.W.2d 169, 170 (Mo. Ct. App. 1994) (citations omitted).

In an attempt to avoid the bar against parol evidence, American Winery argues that the aforementioned correspondence constituted independent, separate agreements obligating Clearly Canadian to supply American Winery with specified levels of production. In support, American Winery points to this court's statement in C.L. Maddox, Inc. v. Benham Group, Inc., 88 F.3d 592 (8th Cir. 1996) that "evidence of an oral agreement that is an independent and separate agreement will not be barred by the parol evidence rule, provided that the oral agreement is not inherently in conflict with the written agreement." Id. at 599 (applying Missouri law). However, C.L. Maddox is readily distinguishable from the instant case. In C.L. Maddox, this court stated that "[w]here the parties bargain for a contract, payment on that contract is made, and the contract is fully performed, we have little difficulty in concluding that the parties intended this interaction to constitute a separate contract." Id. at 600. In contrast, the correspondence in this case purportedly obligates Clearly Canadian to order certain levels of production in the future from American Winery.

In addition, the alleged oral agreement would inherently conflict with the Amended Credit Agreement. The Amended Credit Agreement is an unambiguous and

15

complete written document containing a standard integration clause.[3] Through the integration clause, the parties agreed that the Amended Credit Agreement constituted the sole and final agreement of the parties. See Frisella v. RVB Corp., 979 S.W.2d 474, 477 (Mo. Ct. App. 1998) ("An integration clause generally confirms the all-inclusive nature of the document."). As such, any representations made by Clearly Canadian prior to the execution of the Amended Credit Agreement were not integrated into the Amended Credit Agreement and had no binding effect on Clearly Canadian. Cf. Union Elec. Co., 886 S.W.2d at 170-71 ("The parol evidence rule is particularly applicable in situations like this where the writing contains an integration clause and requires any additions to or alterations in the contract to be in writing and signed by both parties.") (emphasis omitted).

Finally, American Winery argues that even if Clearly Canadian was not contractually obligated to order specific levels of production from American Winery, American Winery should, nevertheless, be afforded relief under a promissory estoppel theory. However, promissory estoppel cannot be used to create rights not included in the contract. See Halls Ferry Inv., Inc., 985 S.W.2d at 853 ("Promissory estoppel cannot be used to engraft a promise on the [contract] that is different from the written terms of the [contract]."). Because this court has found the Amended Credit Agreement unambiguous, American Winery may not use a promissory estoppel theory to expand upon Clearly Canadian's obligations contained therein.

---

[3] Section 10.9 of the Amended Credit Agreement states as follows: "Entire Agreement. This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the parties, whether oral or written."

**B. American Winery's Fraud Claims**

American Winery next asserts that the district court erred in granting summary judgment in favor of Clearly Canadian on American Winery's fraud defenses and counterclaim. Arguing that even if Clearly Canadian was not contractually obligated to order production from American Winery in an amount equal to the Business Plan projections, Clearly Canadian made fraudulent misrepresentations regarding its intent to do so.

> The elements of a submissible case of fraudulent misrepresentation are: (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of its falsity; (5) the hearer's reliance on its truth; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused injury.

Ziglin v. Players MH, L.P., 36 S.W.3d 786, 791 (Mo. Ct. App. 2001). As the Missouri Supreme Court explained in Bank of Kirksville v. Small, 742 S.W.2d 127 (Mo. 1987) (en banc), "[f]raud may be established by circumstantial evidence; however, it may not be presumed, and a party's case will fail if he can show only facts and circumstances which are equally consistent with honesty and good faith." Id. at 131. Nonperformance, without more, does not make out a submissible case of fraudulent misrepresentation. See id. at 132 ("A mere failure of performance does not establish knowledge or intent of the speaker to defraud, nor does it shift the burden of proof."). In order to avoid summary judgment on its fraud defenses and counterclaim, American Winery was required to introduce evidence to establish each of the seven elements. See id. at 131.

Viewing the evidence in the light most favorable to American Winery, the district court concluded that even if Clearly Canadian had represented to American Winery that

it would order production in the amounts equal to the Business Plan projections, American Winery had presented no evidence that Clearly Canadian made this representation knowing that it was false at the time it was made. Disagreeing with the district court's assessment of the record, American Winery points to two pieces of evidence which it believes establishes that Clearly Canadian knew its representation was false at the time it was made.

American Winery first points to the deposition testimony of Clearly Canadian's Senior Vice President, Stuart Ross. Ross testified that the final decisions regarding the allocation of production to its co-packers were not necessarily made on the basis of the Business Plan projections, but, rather, on logistical concerns. Based on this testimony, American Winery contends that Clearly Canadian knew that any representations regarding the future ordering of production at American Winery were false because Clearly Canadian knew that such decisions would ultimately be made on the basis of logistical considerations.

The second piece of evidence to which American Winery cites is Clearly Canadian's decision in 1991 to shift some production from American Winery to two new co-packers. American Winery claims that retaining two new co-packers and shifting some production from American Winery to the new co-packers indicates that Clearly Canadian knew that its representations regarding the future ordering of production from American Winery were false.

We disagree. It is undisputed that in 1992 when Clearly Canadian allegedly made its representations regarding the ordering of future production from American Winery, Clearly Canadian believed that the demand for its product would continue to increase dramatically as it had over the four previous years. It is also undisputed that American Winery did not have adequate capacity in 1991 to bottle as much product as Clearly Canadian projected it would need, requiring Clearly Canadian to contract with other bottlers to meet its anticipated needs. In 1991 and 1992, Clearly Canadian

18

regularly shifted business from one bottler to another to meet increasing demand and to match bottlers with distributors in ways that were logistically sensible. Despite this shifting of orders, Clearly Canadian ordered from American Winery at least as many cases as it could produce until demand for Clearly Canadian's products dropped in late 1992.

All the evidence indicates that in 1992 Clearly Canadian fully expected to keep all of its co-packers, including American Winery, very busy for the foreseeable future. Accordingly, American Winery has failed to adduce evidence that Clearly Canadian made false representations regarding its then present intent to order certain amounts of production from American Winery in the future. American Winery's failure to establish an essential fraud element entitled Clearly Canadian to summary judgment on American Winery's fraud defenses and counterclaim.

Additionally, it is undisputed that American Winery failed to pay the promissory note according to its terms. Because American Winery has failed to establish a defense to its obligations under the promissory note, Clearly Canadian was entitled to summary judgment on the note.

## C. Rand's Fraudulent Misrepresentation and Negligent Misrepresentation Claims

Arguing that Clearly Canadian either fraudulently or negligently represented to Rand that it would purchase American Winery so long as Rand kept the business financially viable, Rand asserts that the district court erred in granting summary judgment in favor of Clearly Canadian on Rand's fraudulent misrepresentation and negligent misrepresentation claims.

In support of his fraudulent misrepresentation claim, Rand alleges that he presented evidence to the district court that Clearly Canadian had concocted an

elaborate scheme to avoid writing off the approximately $2.1 million dollars it had loaned to American Winery. Namely, Rand claims that Clearly Canadian told him it intended to purchase American Winery in the future if Rand continued to invest in American Winery. Rand alleges that Clearly Canadian made these statements solely for the purpose of convincing its auditors that it need not write off the American Winery loans because Rand was committed to, and continuing to invest in, American Winery. Rand primarily points to two statements Clearly Canadian made to its auditors in March 1995:

> We are in the process of re-negotiating the Credit Agreement. We have left it in abeyance to give us an advantage in our negotiations with the principals of [American Winery] to acquire the bottling plant. We have made the decision recently to discontinue our attempt to purchase [American Winery's] plant and will therefore move forward in our negotiation toward a new Credit Agreement and bottling contract.

In April 1996, Clearly Canadian further informed its auditors that it "prefer[red] not to take over [American Winery] because they [sic] do not want to be in the bottling business."

However, as the Missouri Supreme Court has noted, "a party's [fraud] case will fail if he can show only facts and circumstances which are equally consistent with honesty and good faith." Bank of Kirksville, 742 S.W.2d at 131. Far from establishing a fraudulent intent on the part of Clearly Canadian, these statements merely show that Clearly Canadian vacillated in its intention to purchase American Winery. The March 1995 statement indicates that Clearly Canadian had just "recently" decided not to purchase American Winery. This indicates that Clearly Canadian had previously intended to purchase American Winery. Just as Clearly Canadian had changed its strategy in March 1995 regarding the purchase of American Winery, it could reverse this decision in the future. Indeed, Clearly Canadian made three separate offers in 1996 and 1997 to acquire American Winery. Although Rand rejected all three offers after

20

consulting with other American Winery shareholders, Rand considered these offers to be "serious" and "sincere" at the time. Nor is there any evidence that Clearly Canadian would not have followed through had Rand accepted any of the offers.

Additionally, the fact that Clearly Canadian stated in April 1996 that it "prefer[red] not to take over [American Winery] because they [sic] do not want to be in the bottling business" has no bearing on whether Clearly Canadian actually intended to purchase American Winery. This statement merely indicates that Clearly Canadian would prefer not to purchase American Winery, not that Clearly Canadian had no intention of purchasing American Winery.

Rand does not claim Clearly Canadian ever suggested it would purchase American Winery no matter the cost. Nor does Rand claim Clearly Canadian told him it would purchase American Winery by any date certain. Accordingly, Rand's fraudulent misrepresentation claim fails for the same reason as did American Winery's fraudulent misrepresentation claim: Rand has adduced no evidence suggesting that Clearly Canadian's representations regarding its then present intent to take certain actions in the future were false when made.

Rand next argues that even if the district court properly entered summary judgment on his fraudulent misrepresentation claim, the district court erred in entering summary judgment on his negligent misrepresentation claim.

> A cause of action for negligent misrepresentation requires proof that: (1) the speaker supplied information in the course of his or her business because of some pecuniary interest; (2) due to the speaker's failure to exercise reasonable care or competence in obtaining or communicating this information, the information was false; (3) the speaker intentionally provided information for the guidance of a limited group of persons in a particular business transaction; (4) the listener justifiably relied on the information; and (5) as a result of the listener's reliance on the statement,

21

the listener suffered a pecuniary loss. A negligent misrepresentation claim is premised upon the theory that the speaker believed that the information supplied was correct, but was negligent in so believing. Failure to prove any one of the five elements of negligent misrepresentation defeats a litigant's claim.

M&H Enter. v. Tri-State Delta Chem., Inc., 35 S.W.3d 899, 904 (Mo. Ct. App. 2001) (citations and quotation marks omitted). Rand asserts he presented sufficient evidence to satisfy all five elements of his negligent misrepresentation claim.

We disagree. In Missouri, "a negligent misrepresentation claim cannot arise from a statement regarding the speaker's future intent." Hoag v. McBride & Son Inv. Co., 967 S.W.2d 157, 174 (Mo. Ct. App. 1998) (citing Jacobs Mfg. Co. v. Sam Brown Co., 792 F. Supp. 1520, 1528 (W.D. Mo. 1992) (aff'd in part and rev'd in part, 19 F.3d 1259 (8th Cir. 1994)). A claim does not lie for negligent misrepresentation of a speaker's future intent because "it is impossible to be negligent in failing to ascertain the truth or falsity of one's own future intentions. Even if the speaker is merely uncertain regarding the truth of the statement of future intention, the statement is fraudulent rather than negligent because the speaker is ignorant of the statement's truth." Id. (citation omitted). Because Rand, in effect, alleges that Clearly Canadian was negligent in believing that it would purchase American Winery at some undetermined point in the future for some unknown price, Rand's negligent misrepresentation claim must fail under Missouri law.

## D. Clearly Canadian's and the Bank's Security Interests

The Bank argues that the district court erred in two respects in ruling that Clearly Canadian's lien was superior to the Bank's in the Amended Agreement Collateral. First, the Bank alleges that the district court's summary judgment ruling granting Clearly Canadian a priority security interest with respect to the Amended Agreement Collateral is erroneous on the merits. Second, the Bank contends that the district

22

court's summary judgment order is procedurally unsound because the bank was not given the opportunity to present its arguments prior to the order being entered. We shall first examine the Banks's contention that the district court's summary judgment ruling was legally erroneous.

As explained previously, the Bank loaned money to American Winery in 1985, 1988, and 1990. In exchange, American Winery granted the Bank a blanket security interest in all its assets, including all of its current and after-acquired equipment. In 1991, Clearly Canadian obtained a security interest in certain American Winery assets. Pursuant to the Credit Agreement, Clearly Canadian received a security interest in American Winery's assets described as follows in Section 5.1 of the Credit Agreement:

> all equipment, spare parts, supplies and other goods acquired with the proceeds of [Clearly Canadian's] Facility A Loans (it being understood and agreed that all equipment, spare parts, supplies and other goods acquired by the Borrower after the date hereof shall be deemed to have been acquired with proceeds of the Facility A Loans absent a final and conclusive finding by the Bankruptcy Court to the contrary), and all attachments, substitutions, replacements and improvements thereto and therefor. . ., all general intangibles relating thereto . . . and all proceeds and products of all of the foregoing. . . .

The Bankruptcy Court approved the Credit Agreement, and entered an order granting Clearly Canadian a security interest in all "equipment, spare parts, supplies and other goods acquired with the proceeds of [Clearly Canadian's] Facility A Loans. . . ."

In May 1992, Clearly Canadian and American Winery entered into an Amended Credit Agreement which purported to provide Clearly Canadian with a security interest extending to virtually all of American Winery's property, except for certain property that had already been purchased with the Bank's money. Specifically, the security interest is described in Section 5.1 of the Amended Credit Agreement as extending to:

(i) all of [American Winery's] equipment, spare parts, and supplies, excluding the Bank Equipment, (ii) all other goods acquired with proceeds of the Loan, (iii) all attachments, substitutions, replacements and improvements for any of the foregoing, (iv) all general intangibles relating to any of the foregoing (including without limitation all warranty claims and insurance contracts with respect thereto), and (v) all proceeds and products of all the foregoing. . . .

The Bank Equipment described in the Agreement included all equipment as to which the Bank had a valid security interest that was perfected before confirmation of American Winery's reorganization plan. In effect, therefore, the Amended Credit Agreement granted Clearly Canadian a security interest in a broad range of American Winery equipment (with the exception of the narrowly defined Bank Equipment) beyond that equipment which had been purchased with the proceeds of Clearly Canadian's loans.

Two months later, the Bank executed a "Waiver of Interest." Through this document, the Bank expressly waived any interest it might have in American Winery's

(i) equipment, spare parts, supplies and other goods acquired with the proceeds of loans made to Debtor by [Clearly Canadian] (hereafter the "Clearly Related Equipment", which excludes, however, any equipment, spare parts or supplies as to which Bank had a valid, perfected security interest upon confirmation of Debtor's plan of reorganization as filed in the United States Bankruptcy Court . . .); (ii) all attachments, substitutions, replacements and improvements for any of the Clearly Related Equipment; (iii) all warranty claims, insurance contracts and other general intangibles relating to the foregoing; and (iv) all products and proceeds of the foregoing.

The Bank argues that the district court's summary judgment ruling granting Clearly Canadian a priority security interest with respect to the Amended Agreement Collateral is without support in the record. We agree.

The bankruptcy court's final order approving the 1991 Credit Agreement between Clearly Canadian and American Winery gave Clearly Canadian a senior lien only with respect to "equipment purchased with [Clearly Canadian's] Facility A loan funds and property traceable to the funds." The bankruptcy court's order expressly affirmed that (1) the Bank retained its blanket lien on American Winery's equipment, including after-acquired equipment, (2) the bank's lien was not limited to the equipment specifically listed in American Winery's reorganization plan, and (3) such blanket lien survived the bankruptcy proceedings. There is no suggestion in the bankruptcy court's order that the Bank's lien was to be subordinated to Clearly Canadian's lien with respect to any equipment not purchased with Clearly Canadian's Facility A loan.

As for the Bank's Waiver of Interest, the Bank only waived any interest it might have in American Winery equipment "acquired with the proceeds of loans made to debtor by Clearly Canadian. . . ." Thus, rather than affirmatively defining the Bank's security interest in American Winery assets, the Waiver merely described certain of American Winery assets that the Bank was disclaiming all interest in. To the extent the district court used the Waiver to determine which equipment (not addressed therein) the Bank retained an interest in, said use was error.

Notwithstanding the fact that the Amended Credit Agreement is nowhere referenced in the Waiver, Clearly Canadian argues that the Waiver and the Amended Credit Agreement (to which the Bank was not a party) should be "read together" to cover the same equipment. We decline Clearly Canadian's invitation to expansively construe the Waiver by looking outside the four corners of the Waiver.

Rather than "expansively" construe the language of the Waiver, we must give the language of the Waiver its normal and ordinary meaning. Cf. Robbins v. McDonnell Douglas Corp., 27 S.W.3d 491, 496 (Mo. Ct. App. 2000) ("To ascertain the intent of the parties to an unambiguous contract, we give the language used its natural, ordinary, and common sense meaning. . . ."). We need not look outside the

25

Waiver to determine the intent of the parties because the language of the Waiver is unambiguous. Cf. id. ("If a contract is not ambiguous, i.e., when the contract terms are unequivocal, plain, and clear, the intent of the parties is determined from the contract alone and the court is bound to enforce the contract as written."). In addition, the Waiver and the Amended Credit Agreement may not be construed together under the law of Missouri because they were executed nearly two months apart and so construing the Waiver would frustrate the intent of the parties. See Greenberg v. Dowdy, 930 S.W.2d 512, 514 (Mo. Ct. App. 1996) ("Several instruments made at the same time, and relating to the same subject matter *may* be read together as one contract. This rule is employed only for the purpose of giving effect to the intention of the parties and is not applied arbitrarily and without regard to the realities of the situation.") (emphasis in original; citation omitted).

The district court's conclusion that Clearly Canadian had priority over the Bank as a matter of law with respect to the Amended Agreement Collateral is without support in the summary judgment record. Neither the bankruptcy court's order nor the Bank's Waiver of Interest supports such conclusion. There is no other basis from which to conclude that Clearly Canadian had such a sweeping priority. Therefore, to the extent the district court concluded as a matter of law that Clearly Canadian had priority over the Bank with respect to equipment not purchased with Clearly Canadian loan proceeds, said judgment is reversed. Because the district court's summary judgment order granting Clearly Canadian a priority security interest with respect to the Amended Agreement Collateral is reversed, we need not consider the Bank's procedural complaint regarding the summary judgment order.

## III. CONCLUSION

The district court's Final Judgment and Order of Replevin is affirmed in all respects with the exception of its conclusion regarding the security interests of the Bank

via-á-vis Clearly Canadian. Accordingly, the district court's grant of summary judgment in favor of Clearly Canadian with respect to its priority in the Amended Agreement Collateral is reversed and the case remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.