**Michael J. ROTH, et al.,**
**Plaintiffs/Appellants,**

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, et al., Defendants/Respondents.**

No. ED 87148.

Missouri Court of Appeals,
Eastern District,
Division Five.

Oct. 17, 2006.

Application for Transfer to Supreme Court
Denied Dec. 4, 2006.

Application for Transfer Denied
Jan. 30, 2007.

Maurice B. Graham, Thomas K. Neill, St. Louis, MO, for appellant.

G. Carroll Stribling, St. Louis, MO, for respondent, AXA Equitable Life Ins. Co.

William J. Travis, Sandra B. Gallini, St. Louis, MO, for respondent, John Zeman.

ROY L. RICHTER, Judge.

Michael and Rosemary Roth (collectively "the Roths") together with Michael Waxenberg ("Waxenberg") in his capacity as trustee of the Roth Family Irrevocable Trust appeal the trial court's grant of summary judgment in favor of Equitable Life Assurance Society of the United States, AXA Advisors, LLC (together referred to as "AXA"), John Zeman ("Zeman"), and (AXA and Zeman collectively referred to as "Respondents"). We affirm.

Prior to the transactions giving rise to this action, the Roths had regularly invested in insurance, bonds, and brokerage accounts. In the 1990s, the Roths engaged in financial and estate planning. After consulting several insurance and investment representatives, the Roths contacted Zeman on the suggestion of their attorney, Michael Waxenberg, who had previously purchased a policy for himself from Respondents.

The Roths informed Zeman that their primary concern was to provide for their daughter, in addition to their retirement needs. They admitted that they knew that risk would be involved in order to meet their goal of increasing their $450,000 in savings to $1,000,000 in 10 years, and opted to invest accordingly. The Roths purchased five insurance and investment products, three "Accumulator" products and two variable life insurance products from Zeman, an agent for AXA and Equitable.

In November of 1999, the Roths purchased their first Accumulator product for $100,000. Within the Accumulator product, the Roths selected which investments their payments would go towards. The selections were made from among thirty funds available. The Roths were supplied with a prospectus detailing the performance of each fund, as well as what securities were contained in each, before making their selections. In selecting their allocations, they also checked the box for special dollar cost averaging. The certificate summary the Roths received, stated that "[t]hrough a systematic approach to investing, commonly referred to as Dollar Cost Averaging, *you can gradually invest in the market and may actually reduce your average cost over time.*" (emphasis added)

In January of 2000, the Roths purchased another Accumulator product for $200,000. This contract asked whether the Roths had received the Equitable Accumulator prospectus. The Roths marked yes, indicating that they had received the prospectus in October, 1999 (which was a date prior to the purchase of the first Accumulator in November of 1999), and made their investment selections. Another Accumulator policy was purchased in January of 2000, with the Roths once again making the selection of investment options.

The Roths also purchased two variable life insurance policies. One had a face amount of $1,500,000, with a planned annu-

al premium of $5,500 payable quarterly. The policy information the Roths received describes the terms of the variable life insurance policy and stated that "[t]he portion of your policy that is in an investment fund [may] vary up or down depending on the unit value of such investment fund, which in turn depends on the investment performance of the securities held by that fund." The Roths opted to invest in various funds, as well as other options when they purchased another Variable Life Insurance policy.

The Roths were provided with literature explaining and detailing those products, as well as the securities that comprised them. The Roths signed documentation specifically acknowledging that they had received prospectuses concerning the products being purchased, and were familiar with them.

Subsequent to their purchases the market declined. In their depositions, the Roths admitted that they failed to adequately read, or did not read the prospectuses, applications, contracts or policies prior to, or after, applying for and accepting the products they purchased. Further, Mr. Roth admitted that he and his wife failed to do their "due diligence" prior to purchasing the various products.

In 2002, the Roths sent a letter of complaint to the Missouri Department of Insurance and eventually filed a twenty-two count petition against Respondents, citing various theories of recovery, including: fraudulent misrepresentation, fraudulent concealment, fraud—a promise without a present intent to perform, negligence, negligent misrepresentation, breach of fiduciary duty, breach of contract, promissory estoppel, negligent supervision, and punitive damages. Thereafter, Respondents filed a motion for summary judgment alleging the Roths were provided with sufficient information to make their decisions and that no material facts were in dispute. The trial court granted Respondents' motion for summary judgment. This appeal follows.

In an appeal of summary judgment, we review the record in the light most favorable to the party against whom the judgment was entered. *ITT Commercial Finance v. Mid-America Marine*, 854 S.W.2d 371, 376 (Mo. banc 1993). We accord the party against whom summary judgment was entered the benefit of every doubt. *Green v. Washington University Medical Center*, 761 S.W.2d 688, 689 (Mo. App. E.D.1988). Appellate review of the grant of summary judgment is purely a question of law and, hence, employs the same criteria as imposed by the trial court in its initial determination of the propriety of the motion. *ITT Commercial Finance*, 854 S.W.2d at 376. A de novo standard is employed. *Id.* We address each count of the Roths' appeal, which mirror the claims set out in their petition.

■ On the claim of fraudulent misrepresentation: The elements of fraudulent misrepresentation are: (1) a false, material representation, (2) the speaker's knowledge of its falsity or his ignorance of the truth, (3) the speaker's intent that the hearer act upon the representation in a manner reasonably contemplated, (4) the hearer's ignorance of the falsity of the representation, (5) the hearer's reliance on its truth, (6) the hearer's right to rely thereon, and (7) the hearer's consequent and proximately caused injury. *Urologic Surgeons, Inc. v. Bullock*, 117 S.W.3d 722 (Mo.App. E.D.2003). Recovery for fraudulent misrepresentation is not possible if the moving party fails to establish any one of the elements. *Id.* at page 726. While estimates may have been offered over the course of Respondents' conferring with the Roths, the estimates were coupled with recommendations that the Roths seek out-

side counsel and review the prospectuses before choosing to invest. The prospectuses clearly warn of the risks involved in investing in the stock market. Respondents' recommendations were for the Roths to seek advice beyond that of Respondents. In essence, they advised the Roths to seek a second opinion before purchasing. The record shows that the Roths were accompanied by Waxenburg and their Accountant at one of the meetings with Zeman. Although the Roths were provided with documentation warning them of the risks in investing, the Roths failed to read the literature provided. As a result, claims of fraudulent misrepresentation fail.

 On the claim of fraudulent concealment. According to section 516.280 RSMo 2000, and in line with the case of *Batek v. Curators of University of Missouri*, 920 S.W.2d 895 (Mo.1996), the plaintiff must plead the elements of fraudulent concealment. These elements are:

(1) Defendant did or failed to do something that caused the injury;

(2) Defendant's conduct failed to meet the required standards of professional competence and was therefore negligent;

(3) Defendant had actual knowledge that he or she caused the injury;

(4) With that knowledge the defendant intended by post-injury conduct and statements to conceal from the patient the existence of a claim for malpractice;

(5) Defendant's acts were fraudulent; and

(6) Plaintiff was not guilty of a lack of diligence in sooner ascertaining the truth.

Further, the crux of a fraudulent concealment cause of action is that "defendant, by his or her post-negligence conduct, affirmatively intends to conceal from plaintiff the fact that the plaintiff has a claim against the defendant." *Id.* at page 900.

Each of the Respondents provided the Roths with the information explaining that investment vehicles inextricably bound to a market had a historical propensity to fluctuate. The standard of professional competence was met by Respondents disclosing the information they had, and by their encouragement of the Roths to seek outside advice before investing. Here, the Roths cannot establish that Respondents did or failed to do something that caused their injury. Further, no Respondent sought to deprive the Roths of their right to seek judicial redress. No overtures were made to conceal from the Roths their legal rights. The Roths admitted their failure to exercise due diligence in thoroughly reading the materials Respondents supplied to them before making the decision to invest. As a result, the Roths' fraudulent concealment claims fail.

 On the claim of fraud based on a promise without a present intent to perform. "It is well-settled that an unkept promise does not constitute actionable fraud unless it is accompanied by a present intent not to perform, in which case it constitutes a misrepresentation of a present state of mind—itself an existent fact." *Thoroughbred Ford, Inc. v. Ford Motor Company*, 908 S.W.2d 719 (Mo.App. E.D. 1995). Applying that to this case, there is no dispute of material fact that would give rise to a cause of action, and summary judgment was proper. At each stage of interaction, Respondents sought to provide the Roths with financial planning services. Such services would result in a commission to the Respondents. As a consequence, Respondents had a financial incentive to act at the behest of the Roths. The Roths failed to show that Respondents acted without an intent to perform for the Roths. Rather, the evidence shows Respondents

acted in line with the wishes of the Roths. The Roths delineated how they wanted their payment installments invested. Respondents carried out these wishes. Such actions cannot reasonably be claimed to be fraudulent, without a present intent not to perform. As a consequence, the Roths' claims of fraud based on a promise without a present intent to perform fail.

■ On the claim for negligence. For the Roths to succeed on their negligence claim, they must show that Respondents owed them a duty, that the duty was breached, and that the breach was the proximate cause of the injury. *Hoffman v. Union Electric Co.*, 176 S.W.3d 706 (Mo. banc 2005). The standard of care the Respondents owed the Roths that of a reasonably prudent financial planner. That would entail providing information to make a sound decision, advising clients to consider all options before investing, and for the client to properly familiarize themselves with all pertinent information on the matter. The evidence shows that this duty was met. The Roths opted to not heed the recommendations of Respondents and thoroughly read the warnings before investing. Moreover, the damages resulted from the natural twists and turns of a volatile market, not from the actions of Respondents. Respondents' actions cannot be said to be the proximate cause of the Roths' injuries. As a result, the Roths' claim of negligence fails.

■ On the claim under the theory of negligent misrepresentation. The elements of a negligent misrepresentation claim that the plaintiff must prove are: (1) the speaker supplied information in the course of his business; (2) because of a failure by the speaker to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of a limited group of persons in a particular busi-

ness transaction; (4) the listener justifiably relied on the information; and (5) due to the listener's reliance on the information, the listener suffered a pecuniary loss. *Wengert v. Thomas L. Meyer, Inc.*, 152 S.W.3d 379 (Mo.App. E.D.2004).

Here, the evidence does not support a claim for negligent misrepresentation. While estimates may have been offered, they were coupled with recommendations that the Roths seek outside advice before choosing to invest. The Respondents exercised reasonable care in providing the information. There is no evidence that Respondents provided the Roths with false information. Respondents did everything in their power to convey accurate information, and encouraged the Roths to procure outside advice. The evidence shows that the Roths had Waxenberg and their Accountant at some of the meetings with Zeman. As a result, a claim of negligent misrepresentation fails.

■ On the claim under the theory of breach of fiduciary duty. The elements of a fiduciary relationship are: (1) one party must be subservient to the dominant mind and will of the other party as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value, which are the property of the subservient party, must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic and habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party. *A.G. Edwards & Sons v. Drew*, 978 S.W.2d 386 (Mo.App. E.D.1998). Here, evidence shows the Roths were accustomed to using complex contracts and that they never

signed contracts that had not been read and comprehended. In light of their background as investors in the market and familiarity with complex contracts, they could not be deemed subservient. While Respondents did manage the Roths' property, they did so only at the behest of the Roths. Further, Respondents invested for the Roths only after being provided with a detailed listing of what the Roths wanted Respondents to invest in on their behalf. The Roths personally selected the investment vehicles for their money. Respondents did not manipulate or determine in what or where the Roths would invest. The Roths made such determinations after Respondents provided them with information, free of any domination on behalf of Respondents.

 Moreover, Zeman acted within the proper scope of his authority, and discharged his fiduciary obligations properly. "When an insurance broker agrees to obtain insurance for a client, with a view to earning a commission, the broker becomes the client's agent and owes a duty to the client to act with reasonable care, skill, and diligence". *Bell v. O'Leary*, 744 F.2d 1370, 1372 (8th Cir.(Mo.) 1984); citing *Barnes v. Metropolitan Life Ins. Co.*, 612 S.W.2d 786, 787 (Mo.App.1981). Here, Zeman procured the products applied for by the Roths. But for the poor performance of the stock market in the months immediately following the purchase of these products, this suit would not be before this court. The suit did not result from the execution of Zeman's fiduciary duties. Rather, it resulted from the market's anemic performance. The discharge of fiduciary obligations was met. The evidence indicates that they actively encouraged the Roths to fully investigate their investment options before deciding. When determining an issue of imposition of duty on insurers, the Court is making a

policy determination. Such an imposition rests on factors such as: capability of insurers to determine proper products and services for the insured, ability of insurers to function as financial counselors of the insured, the insured's familiarity with his own assets and preferred coverage, insurer liability for failure to properly advise insured of every possible option, insureds would have the opportunity to seek coverage for a loss after it occurred merely by asserting that they would have bought additional coverage if it had been offered. *Farmers Ins. Co. v. McCarthy*, 871 S.W.2d 82 (Mo.App. E.D.1994). Finding such a fiduciary duty would defeat the very underpinnings of the insurance industry. People "take an 'intellectual gamble' when purchasing insurance as they weigh the expense of insurance versus the amount of coverage that they purchase. Allowing insureds to seek coverage, post-occurrence, allows them to completely circumvent this risk." *Id.* at 86. It is not the place of the court to construct a duty, above and beyond that presently mandated, just for the Roths. The Roths' claim of breach of fiduciary duty fails.

 On the claims of breach of contract. "[A]bsent a showing of fraud, a party who is capable of reading and understanding a contract is charged with the knowledge of that which he or she signs." *Binkley v. Palmer*, 10 S.W.3d 166 (Mo. App. E.D.1999). The Roths have presented no evidence of fraud. As such, the Court must recognize that they were capable of reading and understanding the various investment agreements. They are charged with knowledge of the contents of those agreements. *Id.* The contract given to the Roths was accompanied by a recommendation that outside advice be sought before signing. The contracts were not the result of fraud. Rather they were the result of deliberation on behalf of both

parties. Both parties are deemed to be fully cognizant of the essential terms, and are therefore bound by them. As a result, all breach of contract claims fail.

■ On the claims under the theory of promissory estoppel. "To recover on the basis of promissory estoppel there must have been (1) a promise, (2) on which the party seeking to recover relied to his or her detriment, (3) in a way the person making the promise expected or should have expected, and (4) the reliance resulted in an injustice which can be cured only by enforcement of the promise." *Halls Ferry Investments, Inc. v. Smith,* 985 S.W.2d 848, 853 (Mo.App. E.D.1998). "[P]romissory estoppel is not available ... when an unambiguous contract exists that covers the issue for which damages are sought. Promissory estoppel cannot be used to create rights not included within the contract." *Id.* at 853. Here, the agreements were unambiguous. The agreements covered investment in a volatile market. The evidence shows that by selecting investment options included in the contract, the Roths were not only aware of this market involvement, but acquiesced to it. Ergo, the claims of promissory estoppel fail.

■ On the claim of negligent supervision. A master is under the duty to exercise reasonable care to control his servant while acting outside the scope of his employment, to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them. *Reed v. Kelly,* 37 S.W.3d 274 (Mo.App. E.D.2000). A cause of action for negligent supervision also requires evidence that would cause the employer to foresee that the employee would create an unreasonable risk of harm outside the scope of his employment. *Id.* at 278. In this case, the Roths allege that Equitable and AXA were negligent in supervising their agent, Zeman. Zeman properly warned the Roths about investing in the market, as well as an admonition that investing should only be commenced after consulting with other legal and financial advisors, and fully comprehending the contracts. The Roths opted to heed only a part of Zeman's advice. The Roths opted not to exercise their due diligence. This failure cannot be transferred to Zeman.

"When an insurance broker agrees to obtain insurance for a client, with a view to earning a commission, the broker becomes the client's agent and owes a duty to the client to act with reasonable care, skill, and diligence." *Bell v. O'Leary,* 744 F.2d 1370, 1372 (8th Cir.(Mo.) 1984); (citing *Barnes v. Metropolitan Life Ins. Co.,* 612 S.W.2d 786, 787 (Mo.App. E.D.1981)). Here, Zeman procured the products applied for by the Roths. But for the poor performance of the stock market in the months immediately following the purchase of these products, this suit would not have been brought. Consequently, the claim of negligent supervision fails.

Finally, we consider the Roths' claims for punitive damages. However, because the Roths never established any basis for actual damages, the Roths' claims of punitive damages also fail.

In conclusion, the trial court did not err in entering summary judgment in favor of Respondents where there were no genuine issues of material fact and Respondents were entitled to judgment as a matter of law. The judgment is affirmed.

GLENN A. NORTON, C.J., and LAWRENCE E. MOONEY, J., Concur.