# United States Court of Appeals
### For the Eighth Circuit

_____

## No. 22-1114

_____

Principal National Life Insurance Company

*Plaintiff - Appellee*

v.

Donna T. Rothenberg

*Defendant - Appellant*

v.

Robert W. Bagby

*Counter Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 12, 2023
Filed: June 12, 2023

_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Dr. Robert P. Rothenberg (Rob) tragically suffered a fatal heart attack prior to paying the initial premium on his term life insurance policy issued by Principal National Life Insurance Company (Principal). Principal filed this action in the district court,[1] seeking a declaratory judgment that Donna T. Rothenberg (Donna)— the policy's intended beneficiary—was not owed death benefits in light of the nonpayment. Donna filed a counterclaim, asserting claims against Principal for breach of contract, vexatious denial of proceeds, and negligence, as well as claims against Robert W. Bagby, the couple's insurance broker and financial planner, for negligence. After the parties filed cross-motions for summary judgment, the district court granted summary judgment in favor of Principal and Bagby, finding, in part, that the policy was not in effect at the time of Rob's death. Donna appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Rob maintained a life insurance policy for many years with Jackson National Life Insurance Company (Jackson National) for the benefit of Donna. As the couple's long-time financial planner and insurance broker, Bagby procured the policy for Rob. Bagby met with the couple yearly to discuss investments, but their contact was otherwise episodic.

Rob contacted Bagby in early 2019 concerning the policy's renewal. Rob told Bagby that he intended to let the plan lapse at the end of its "grace period," on April 14, 2019, because Jackson National had informed him that the policy's premium would substantially increase upon renewal. Bagby encouraged Rob to obtain another life insurance policy, given that Rob's dental practice was the family's primary source of income. Rob heeded Bagby's advice and asked him to procure a policy with approximately the same premium as Rob had been paying on the Jackson National policy. Bagby agreed and eventually recommended a $200,000 term life

---

[1]The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

-2-

insurance policy offered by Principal. Rob and Bagby met in February 2019 and completed the application for the policy. On or about April 1, 2019, Principal issued the policy. However, Bagby discovered soon thereafter that the face value of the policy could be increased to $250,000 for a similar premium as the Jackson National policy. Rob elected to increase the face amount of the coverage. Accordingly, on or about April 15, 2019, Principal sent Bagby the relevant paperwork for the $250,000 term life insurance policy (the Policy), which stated that the Policy was issued on April 5, 2019. Bagby received the documents on April 23, 2019, which was after Rob's Jackson National policy had lapsed.

The following describes the documents received by Bagby and the relevant language from each:

- A cover letter, dated April 15, 2019 (the Cover Letter), which states in part, "You authorized us to draw funds directly from your bank account. Electronic fund transfers will be scheduled to draw on your policy date in the amount of $225.76 monthly [the amount of the monthly premium for the Policy]."

- The Policy, dated April 5, 2019. The Policy states that "[b]enefits [are] payable at the death of the Insured prior to the Policy Expiration Date and while [the P]olicy is in force." The effective date of the Policy "is the date on which all requirements for issuance of [the P]olicy have been satisfied." One of these requirements is the payment of the first premium, which "must be paid in advance of the [P]olicy becoming effective and is due on the Policy Date." And while a 31-day "grace period" is allowed for the payment of premiums, this grace period does not apply to the payment of the first premium. Death proceeds will be paid to a beneficiary only upon submission of proof that "the Insured died while the [P]olicy was in force and prior to the Policy Expiration Date." Finally, all of the insured's "privileges and rights under th[e P]olicy terminate" when "the Insured dies."

- Part C – Agreement/Authorization to Obtain and Disclose Information, dated February 16, 2019, and completed and executed by Rob as part of his initial application and incorporated into the Policy (as stated in the Cover Letter). In this agreement, Rob checked a box indicating that his application was submitted without a premium deposit and that he had not been given any "Conditional Receipt with this application." In this agreement, Rob also acknowledged the following:

> **When Policy Coverage Becomes Effective:** I understand and agree that if a policy is issued as applied for with a premium deposit paid, policy coverage will become effective as of issuance. The Company [Principal] agrees to pay any proceeds pursuant to policy terms subject to the acceptance of the proposed owner and signing of Part D, if applicable.
>
> I understand and agree that if a policy is issued as other than applied for or without a premium deposit (C.O.D.), then policy coverage is not effective and the Company [Principal] shall incur no policy liability unless:
>
> 1) A policy issued on this application has been physically delivered to and accepted by the owner and the first premium paid; and
> 2) At the time of such delivery and payment, the person to be insured is actually in the state of health and insurability represented in this application, medical questionnaire, or amendment that becomes a part of this application . . . .
>
> If these conditions are met, the policy is deemed effective on the Policy Date stated in the policy data pages.

- Part D – Agreement/Acknowledgement of Delivery, which, among other things, restates the Part C acknowledgement listed above.

-4-

- A Statement of Policy Cost and Benefit Information, dated April 15, 2019, which lists the "Guaranteed Annual Premium" and "Death Benefit" for a given "Policy Year."

- Individual Life Insurance Amendment and Acceptance Form, which identifies that the Policy modified the previous $200,000 policy by increasing the amount of insurance to $250,000 and the cost of the monthly premium to $225.76.

- Payment Authorization for Electronic Fund Transfers form (the EFT Form), which states in part:

  > **NOTE: We are unable to draw funds if any of the required fields marked with an asterisk (\*) are left blank, incomplete, or if this form is not signed.  Any Conditional Receipt coverage will be void.**
  >
  > . . . .
  >
  > **Complete Your Bank Information Below, or Submit Voided Check**
  > **\*A)  ACH Routing Number** (Only if listed on your check)
  > _____
  > **\*B)  Bank Routing Number** (This number is the first 9 numbers.  Please do not include any alpha or special characters)
  > _____
  > **\*C)  Account Number** (Include all preceding zeros on your account number)
  > _____

- Delivery Instructions, dated April 15, 2019, which states in part:

  > **Sign and return to the Home Office:**
  > - Part D Agreement/Acknowledgement of Delivery

- Amendment Form
- Collect $225.76
  Check or Payment Authorization Form DD9073. Policy effective date will become the date the last contractual delivery requirement is signed/dated, unless signed Backdating Form, DD1621 is received. This backdating may change insured age and premium draw date if monthly. Revised data pages will be mailed directly to the policy owner(s).
- (EFT) Payment Authorization for Electronic Fund Transfers DD 9073

Bagby and Rob met on April 26, 2019, to discuss the paperwork and execute the necessary documents. Rob signed and dated the documents, which—because he elected to make a lump sum payment for his annual premium through his and Donna's joint bank account—included the EFT Form. Although Rob signed the EFT Form, he did not provide his banking information as required. The parties dispute whether Bagby informed Rob that only Rob's banking information was required, as opposed to a blank check (an alternative permitted by the form), but all agree that the banking-information portion of the form was incomplete.

After Rob left Bagby's office, Bagby noticed the incomplete EFT Form. Bagby called Rob that afternoon and informed him that a voided check was required to complete the paperwork. Bagby allegedly told Rob that the Policy would not be in force until the first premium was paid. Rob responded that he was on a bike ride and would bring a voided check to Bagby the following Monday. Unfortunately, Rob suffered a fatal heart attack later that day.

After Rob's death, Bagby informed Donna of the missing banking information. Donna then sent a voided check to Bagby, who in turn provided it to Principal. Donna subsequently submitted a claim to Principal, contending that the Policy had become effective on April 26, 2019, and that the $250,000 death benefit was payable to her. Principal denied the claim, stating that the Policy had never

become effective because Rob had not provided his banking information or otherwise paid the initial premium before his death.

Principal initiated this action on August 16, 2019, by filing a complaint against Donna in the United States District Court for the Eastern District of Missouri, seeking a declaration that the Policy had never become effective and that Donna was not entitled to the death benefits. Donna filed an answer and a counterclaim against Principal for breach of contract and vexatious denial of proceeds under Missouri law. Donna additionally sued Bagby for two counts of negligence: one in his capacity as the couple's insurance broker (for which she claims Principal was additionally liable under a respondeat superior theory of liability) and one in his capacity as the couple's financial planner.

The parties filed cross-motions for summary judgment. Relying on the language of the Policy and Missouri law, the district court determined that the Policy had not become effective by the time of Rob's death based on the failure to pay the initial premium, so Donna was not entitled to the death proceeds. It necessarily dismissed the vexatious-denial-of-proceeds claim. Next, the district court found neither Principal nor Bagby negligent because neither party owed Donna a duty as a third-party beneficiary of an ineffective policy. Finally, the district court found that Bagby owed no special duty to Donna by virtue of being the couple's financial planner or insurance broker. Accordingly, the district court granted summary judgment in favor of Principal and Bagby.

Donna appeals, arguing that the district court erred in concluding (1) that the Policy was not in effect at the time of Rob's death and (2) that, assuming the Policy was not in effect, neither Principal nor Bagby were negligent because neither owed a duty to Donna. "We review de novo the district court's resolution of cross-motions for summary judgment, 'viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences.'" Dallas v. Am. Gen. Life & Accident Ins. Co., 709 F.3d 734, 736 (8th Cir. 2013) (citation omitted). Summary judgment is appropriate "if 'the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Richardson v. Omaha Sch. Dist., 957 F.3d 869, 876 (8th Cir. 2020) (citation omitted). "Because this case is before us on diversity jurisdiction, we must 'apply the substantive law of the forum state'"— Missouri—looking to the decisions of the highest court and, in the absence of such decisions, "intermediate appellate court decisions [when] they are the 'best evidence' of state law[] to predict how the highest court . . . would resolve the issue." Gage v. HSM Elec. Prot. Servs., Inc., 655 F.3d 821, 825 (8th Cir. 2011) (citations omitted). Applying these standards, we address each of Donna's arguments in turn.

II.

Donna first argues that the Policy was in effect at the time of Rob's death. "To establish coverage under the [P]olicy, following Missouri law," Donna "must 'show[] (1) issuance and delivery of the [P]olicy; (2) payment of the premium; (3) a loss caused by a peril insured against; and (4) notice and proof of loss to the insurer.'" Dallas, 709 F.3d at 737 (second alteration in original) (citation omitted). Only the second element is at issue: whether the initial premium was considered paid by the time of Rob's death. "Under Missouri law, general rules of contract interpretation govern the interpretation of insurance policies. Policy terms are given the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." Bauer v. AGA Serv. Co., 25 F.4th 587, 590 (8th Cir. 2022) (citation omitted). "'When there is ambiguity in an insurance policy, the Court must interpret the policy in favor of the insured.' 'However, "where insurance policies are unambiguous, they will be enforced as written."'" Dallas, 709 F.3d at 737 (quoting Todd v. Mo. United Sch. Ins. Council, 223 S.W.3d 156, 160 (Mo. 2007) (en banc)). Moreover, "[a] court is not permitted to create an ambiguity in order to distort the language of an unambiguous policy, or, in order to enforce a particular construction which it might feel is more appropriate." Rodriguez v. Gen. Accident Ins. Co. of Am., 808 S.W.2d 379, 382 (Mo. 1991) (en banc).

Here, the Policy states that death benefits are payable only "while th[e P]olicy is in force." The "effective date" of the Policy "is the date on which all requirements for issuance of [the P]olicy have been satisfied." Importantly, and consistent with Missouri law, the "first premium must be paid in advance of the [P]olicy becoming effective." The first premium "is due on the Policy Date," and the grace period provision is not applicable to the first premium. Further, on Part C and Part D of the Policy, the insured must acknowledge that "if [the P]olicy is issued . . . without a premium deposit . . . then policy coverage is not effective" unless, inter alia, the Policy "has been physically delivered to and accepted by the [insured] and the first premium paid" and the insured is in "the state of health and insurability" represented in the policy application.

Rob elected to forgo paying an advance premium on his application, which meant that the Policy would not be effective until he had paid his first premium. Wishing to pay the premium through his and Donna's joint bank account, he utilized the EFT Form but did not input his banking information. The absence of this information prevented Principal from withdrawing funds. Because the initial premium was not paid at the time of Rob's death on April 26, 2019, the Policy's unambiguous language dictates that it was not in effect and, thus, Principal was not liable for coverage.

Donna argues that multiple facts dictate that the Policy was in effect at the time of Rob's death: (1) the Policy Date was April 5, 2019; (2) Rob signed the EFT form; and (3) the facts demonstrate that Principal considered the Policy to be effective. First, that the Policy was dated April 5, 2019, is of no moment. "Generally, under Missouri law, 'payment of a first premium is a condition precedent to validity of the policy.'" Dallas, 709 F.3d at 737 (citation omitted). "[A] condition precedent is an act or event that must be performed or occur, after the contract has been formed, before the contract becomes effective." Id. at 738 (citation omitted). The language of the Policy comports with this general understanding. The Policy—that is, the contract—may have been formed on April 5, 2019, but it did not become effective until "all requirements for issuance of a policy ha[d] been

satisfied," which included payment of the first premium. While Part D of the Policy permits backdating the effectiveness of the Policy to the Policy Date, the Policy first requires the payment of the first premium *and* that the applicant be in the same state of health at the time of such payment. Donna did not pay the initial premium until after Rob's death, at which time he was not in a similar state of health as when he applied for the policy. Moreover, any "privileges and rights" Rob (or Donna) had to retroactively effectuate the Policy were terminated at Rob's death pursuant to the Policy's termination provision.

Second, Rob's signature on the EFT Form alone did not render the Policy effective on April 26, 2019, or earlier. Donna contends otherwise, relying on the following language from the Delivery Instructions: "Policy effective date will become the date the last contractual delivery requirement is signed/dated . . . ." This language does not circumvent the prerequisite of the initial premium payment, which is also listed as a requirement in the Delivery Instructions. To be sure, the Policy states that premium payments are considered payments only if honored by the financial institution. Accordingly, we cannot reasonably read the Policy to consider Rob's initial premium "paid" when Principal did not even have the ability to request a withdrawal from Rob's financial institution. To the extent this Delivery Instruction language permitted the backdating of the Policy to the date Rob signed the EFT Form once Donna paid the initial premium, she faces the same problem as above: any rights to effectuate the Policy terminated upon Rob's death.

Each Policy is governed by its own language. See id. ("[W]here insurance policies are unambiguous, they will be enforced as written absent a statute or public policy requiring coverage."). And, our determination is bolstered by Dallas v. American General Life & Accident Insurance Co., 709 F.3d 734 (8th Cir. 2013), a case decided on substantially similar facts. In that case, the plaintiff took out a life insurance policy on her father's life and listed herself as the beneficiary. However, when filling out the "Automatic Bank Check Authorization Agreement," equivalent to the EFT Form at issue here, she provided an inaccurate account number and listed the wrong account holder. Id. at 735. Accordingly, the initial premium was never

-10-

paid, and the insurance company mailed her father notice of the same. Id. Her father later died, and the plaintiff submitted a claim for death benefits and subsequently mailed the delinquent payments to the insurance company. Id. at 736. The insurance company denied the claim, noting that the policy was never in effect. Id. We affirmed the district court's grant of summary judgment in favor of the insurance company. Id. at 735. Looking to the policy's language (language which substantially mirrors the language at issue here) and Missouri law, we held that the initial premium was a condition precedent to the policy's coverage and the inaccurate account number prevented the condition from being satisfied. Id. at 739. Accordingly, the policy was not in force and coverage was not in effect at the time of plaintiff's father's death. Id. While Donna argues that Dallas is factually distinguishable—she notes that the plaintiff had insufficient funds to pay the initial premium and that the payment form explicitly stated that payments were not deemed to have been made until the payment was received by the company's office—we find that these facts do not require a different result in the case at bar.

Third, Donna argues that, despite the unambiguous language of the Policy, Principal nonetheless considered the Policy effective prior to Rob's death. She notes that Principal labeled the Policy as "cancelled" in its internal system, as opposed to "not taken" or "completed." The record demonstrates that Principal tracks the application process using three labels: not taken, completed, and cancelled. Because Rob did not reject the Policy, Principal did not consider "not taken" to be an appropriate label. And because Rob never completed the requirements for the Policy to become effective, Principal likewise found "completed" to be an inappropriate representation of the situation. Accordingly, it adopted the remaining "cancelled" label for its internal administrative purposes. R. Doc. 77-4, at 2. Thus, the record shows that applying this "cancelled" label to the Policy was explainable and a necessary result of Principal conforming the unique circumstances of the situation to its tracking system.

Donna also points to the Cover Letter, which stated: "You authorized us to draw funds directly from your bank account. Electronic fund transfers will be

scheduled to draw on your policy date in the amount of $225.76 monthly [the amount of the monthly premium for the Policy]." She argues that this language clearly shows that Principal treated the EFT Form as complete and the Policy as effective. However, the Cover Letter was sent with the blank EFT Form to be completed by Rob, so it has no bearing on whether Principal viewed the subsequently signed form as complete or not. To the extent that this language indicates some *prior* authorization, it nonetheless does not demonstrate that Principal had the ability to withdraw funds from Rob's financial institution, nor does Donna provide any evidence suggesting that Principal did. Accordingly, we find these facts, individually and together, immaterial in light of the Policy's unambiguous language.

Finally, Donna submits an abundance of out-of-state precedent in support of her contrary views of the law and our reading of the Policy. However, sitting in diversity jurisdiction, we must predict how the Supreme Court of Missouri, not another state, would decide the issue. See Gage, 655 F.3d at 825; see also Dallas, 709 F.3d at 736. She further asserts multiple factual disputes exist (such as inconsistencies in Rob and Bagby's April 26 conversation) in an effort to evade summary judgment, but these purported disputes are immaterial as they do not weigh on our interpretation of the unambiguous language of the Policy. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). Because Donna does not explain why Missouri law or these alleged factual disputes would require deviating from the unambiguous language of the Policy, we conclude that the district court did not err in determining that the Policy was not in effect at the time of Rob's death.

Having found that the Policy was not in effect and, thus, that Donna was not entitled to death benefits, we must necessarily affirm the district court's subsequent dismissal of Donna's vexatious-denial-of-proceeds claim. See Dhyne v. State Farm Fire & Cas. Co., 188 S.W.3d 454, 457 (Mo. 2006) (en banc) (noting that a claim for

vexatious refusal to pay requires, among other things, an underlying insurance policy).

III.

Donna argues in the alternative that if the Policy were not in effect at the time of Rob's death, then Bagby and Principal were negligent by not effectuating the Policy. Donna raised two similar but distinct counts of negligence before the district court. The first count claims that Bagby was negligent by failing to effectuate the Policy as the couple's insurance broker. In doing so, Donna asserts that Principal is also liable under a respondeat superior theory of liability because, she argues, Bagby was acting as Principal's agent in procuring the Policy. The second count again claims that Bagby was negligent but in his capacity as the couple's financial planner and for not obtaining gap insurance for the couple.

A.

The district court rejected Donna's first claim because it determined that neither Principal nor Bagby owed a duty to Donna as the third-party beneficiary of an ineffective insurance policy. To prevail on an action for negligence in Missouri, "a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury." Wieland v. Owner-Operator Servs., Inc., 540 S.W.3d 845, 848 (Mo. 2018) (en banc). On appeal, Donna argues that Bagby's duty arises from (1) Donna being a third-party beneficiary of the Policy and (2) Bagby's role as the couple's insurance broker.

First, any duty arising from Donna being named the beneficiary of the Policy is rooted in contract, not tort. See State ex rel. William Ranni Assocs., Inc. v. Hartenbach, 742 S.W.2d 134, 140 (Mo. 1987) (en banc) ("To determine the character of an action, whether tort or contract, it is necessary to ascertain the source of the duty claimed to be violated. . . . Because the duty breached in this case stems

-13-

from the contract, the breach does not amount to a tort."). The appropriate vehicle to remedy a violation of that duty is a breach-of-contract claim, not negligence. See L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr., L.P., 75 S.W.3d 247, 260 (Mo. 2002) (en banc) ("A third party beneficiary is one who is not privy to a contract or its consideration but who may nonetheless maintain a cause of action for *breach of the contract*." (emphasis added) (citation omitted)). Indeed, Donna brought a breach-of-contract claim, though it fails for the reasons stated above. See supra Part II.

Second, while Donna argues that Bagby served as the couple's insurance broker, his actions here related to his capacity as *Rob's* insurance broker. "[A]n insurance broker, unless otherwise authorized and provided, represents the *insured* and, unless otherwise shown by the evidence, is to be regarded as the agent of the *insured*." Emerson Elec. Co. v. Marsh & McLennan Cos., 362 S.W.3d 7, 12 (Mo. 2012) (en banc) (emphasis added) (citation omitted). Accordingly, Bagby's duties related to procuring the Policy were to Rob—the insured—not Donna—the prospective beneficiary. See Blevins v. Am. Fam. Mut. Ins. Co., 423 S.W.3d 837, 841 (Mo. Ct. App. 2014) ("[T]ypically cases in which the liability of an agent can extend to a third party require separate tortious acts to be committed by the agent.").

To the extent Donna alleges that Bagby was negligent in acting as *Principal's* agent in ensuring that the Policy went into effect for Rob, we find Forck v. Prudential Insurance Co. of America particularly applicable. There, a husband applied for, and paid the premium on, a life insurance policy, naming his wife as the beneficiary. 66 S.W.2d 983, 984-85 (Mo. Ct. App. 1933). Before the insurance company approved the application, the husband died. Id. The wife brought a negligence claim against the insurance company, alleging that it had a duty to accept the application within a reasonable time. Id. The Missouri Court of Appeals held otherwise, noting that only the person to whom the duty is owed may assert a breach of that duty. Id. at 984. The court reasoned "that the injury was to the applicant," the husband, and that the wife, as the beneficiary of a mere application, was owed no duty. Id. ("Negligence is a positive wrong, a breach of duty, and no person may recover damages because

-14-

of the wrong save the one to whom the duty was owing.") The court left open whether and how the husband's estate might pursue the claim. Id.

Admittedly, the facts here are slightly reversed. Principal had already accepted Rob's application, but he had not paid the first premium. However, we find the distinction immaterial because the result is the same: there was no underlying effective policy. Accordingly, Forck leads us to predict that the Supreme Court of Missouri would find that Bagby did not owe a duty to Donna, a prospective third-party beneficiary, and we accordingly affirm the decision of the district court. See Davis v. Lambert-St. Louis Int'l Airport, 193 S.W.3d 760, 765 (Mo. 2006) (en banc) ("[I]f an employee is exonerated from liability because the employee has not committed a tort, the [principal] also is exonerated.").

B.

Donna's other claim is that Bagby was negligent in his capacity as the couple's "financial advisor and financial planner." On appeal, Donna argues "that Bagby's engagement to procure a replacement insurance policy on Rob's life embodied a duty to procure replacement insurance that took effect prior to the Jackson National policy lapsing, so there would be no gap in coverage and Donna and Rob would be continuously protected by life insurance." Appellant's Br. 50. However, it is clear that this claim related not to Bagby's role as the couple's financial planner, but rather to his role, again, as their insurance broker, a distinct capacity under Missouri law. For example, in Roth v. Equitable Life Assurance Society of the United States, the Missouri Court of Appeals reviewed the plaintiff's negligence claim against the defendant in its capacity as plaintiff's financial planner under a "reasonably prudent" standard and separately reviewed plaintiff's negligent supervision claim against the defendant in its capacity as plaintiff's insurance broker under a "reasonable care, skill, and diligence" standard. See 210 S.W.3d 253, 260, 262 (Mo. Ct. App. 2006) (citation omitted). Because these distinct capacities encompass distinct duties and because Donna in substance asserts a breach of Bagby's duty in his capacity as the couple's insurance broker, we will look only to

the duties applicable to him in that role (acknowledging that we have already found that Bagby owed Donna no duty to effectuate the Policy in this capacity).

An insurance broker has a duty to "exercise reasonable care, skill and diligence in procuring insurance." Emerson Elec. Co., 362 S.W.3d at 13. However, Missouri does not recognize a duty on the part of an insurance broker to advise customers as to their particular insurance needs or as to the availability of optional coverage. See id. Even so, Donna argues that the "relationship between [Rob and Bagby] as well as the nature of [the] agreement[] that existed between them" to procure a new life insurance policy broadened the general scope of fiduciary duties owed by an insurance broker to include procuring gap insurance. Id. at 20. However, Donna does not point to any record evidence suggesting that providing gap insurance was explicitly or implicitly in Bagby's agreement to find Rob a new life insurance policy. Even if it were, that duty would run to Rob, not Donna, as explained above. See Blevins, 423 S.W.3d at 841.[2] Accordingly, the district court did not err in granting summary judgment in favor of Bagby on this claim.

_____

[2]Regarding her negligence claims, Donna contends that "at no time was it ever contemplated that Rob's estate would be the beneficiary of the life insurance that Bagby was procuring" and that it "suffered no harm as a result of Bagby's negligent acts and omissions." Appellant's Br. 27 n.6. Accordingly, Donna claims that she is the only party capable of properly asserting the claims, as "Bagby and Principal surely would have attacked any claims asserted by Rob's estate" on the basis of standing. Id. However, whether an estate can pursue these types of negligence claims is the exact question that Forck expressly left open. See 66 S.W.2d at 984 ("Neither will we determine the question as to whether or not the cause of action, if any, survived to his legal representative for the reason that such questions are not presented in the record."). But, as in Forck, whether Rob's estate may pursue these claims is a question not presented in this appeal nor is Rob's estate a party to this litigation, so we express no opinion on the issue, acknowledging only that Rob's estate's ability to bring the suit, or lack thereof, does not enable Donna to assert a breach of a duty that runs to Rob.

-16-

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

_____